**BALTIMORE & O. R. CO. et al. v. UNITED STATES.**

No. 2975.

District Court, N. D. New York.

July 1, 1936.

Carleton W. Meyer, of New York City, for plaintiffs.

E. M. Reidy, of Washington, D. C., for Interstate Commerce Commission.

Elmer B. Collins, of Washington, D. C., for the United States.

L. HAND, Circuit Judge.

This is the usual suit in equity to review the action of the Interstate Commerce Commission which directed the plaintiff railroads to establish through rates in the circumstances set forth below. No other question is raised but that of the Commission's jurisdiction; if it is lawful to treat the two legs of the transportation in question as a single interstate route, the plaintiffs agree that they must lose; on the other hand the defendants agree that when both termini of either of those legs are points in the same state, an injunction must go, unless that route may be joined to a concededly interstate route. At the outset and by way of preliminary, it will be convenient to separate the transportation here at bar into four different kinds: (1.) from points outside New York to Cadosia, New York, thence to points outside New York; (2.) from points within New York to Cadosia, thence to points outside New York; (3.) from points outside New York to Cadosia, thence to points within New York; (4.) from points within New York to Cadosia, thence to points within New York. Only the second and third situations are before us; the first is conceded to be within the jurisdiction of the Commission; the fourth is conceded not to be; what we shall say is limited to the other two.

The industrial situation, as the Commission has found the facts, and as we must and do accept them, is as follows: The shippers on whose complaint the order was made, make wood alcohol by the process of "destructive distillation" out of which come charcoal and crude "methanol," which last is unsalable and useless in the arts; industrially speaking, it is an in-

termediate product. The shippers might refine it themselves by further distillation, and ship what the art wants in the condition that it wants it; but as this requires expensive plant, they delegate that phase of the production. There are in all about twenty of them, situated either in western New York or Pennsylvania; they have formed a company called the Wood Distillers Company, through which they deal with a refiner, the Keery Company, whose plant is in Cadosia, New York, a small village near the city of Binghampton. Thither the crude "methanol" is shipped in tank cars which are emptied from sidings into storage tanks. The Keery Company does not try to keep the crude "methanol" of each shipper separate; all is mixed together in a tank as it comes in, each owner being merely credited with the gallonage which he delivers. Refining is distilling, the crude "methanol" emerging in four end products: refined "methanol," methyl acetate, acetone and a fourth complicated substance, made up of various hydrocarbons. All these have some commercial use, as we understand it, though the Commission's findings speak only as to the first. When the crude product arrives at Cadosia its eventual destination is not yet known, and the refined substances are for the most part sold by the William S. Gray Company in its own name, as an undisclosed agent for the shippers, though the Keery Company does some selling, also in its own name. The record does not certainly disclose how the sales are allocated to the shares of the several shippers; it would appear to be as difficult to trace the identity of the contents of a given tank into the goods delivered in performance of a given contract, as it is to keep separate the contribution of any single shipper to the contents of a given tank. However, as we cannot see that that question has any bearing upon the result here, we shall assume that when the Gray Company sells any of the refined substances, it is possible to allocate the contract and the delivery to the proper seller. All but about five per cent. of the end products is shipped by rail; the rest is delivered within a radius of fifty miles by truck. The shippers insisted before the Commission that these facts made out a case for a through rate from the point of origin within or outside New York through Cadosia to the consumer within or outside New York, at least in the first, second and third classes mentioned above. By a divided vote a division of the Commission held that they were right, and the whole Commission confirmed that ruling, though again not unanimously. Thomas Keery Company v. New York, O. & W. R. Co., 206 I.C.C. 585; Id., 211 I.C.C. 451. The railroads then filed this bill under section 41 (28) of title 28, U.S.Code (28 U.S.C.A. § 41 (28). The evidence taken before the Commission has been received in evidence upon final hearing before a statutory court assembled under section 47 of title 28, U.S. Code (28 U.S.C.A. § 47) and the cause stands for decree.

The situation is of a familiar kind, so often passed upon by the Supreme Court that its decisions alone are of service, though it has never had the precise situation before it. Schechter Poultry Corp. v. U. S., 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, its last declaration, does not help us; interstate commerce had there ended before federal regulation began, and the only question was whether the regulated activities reacted upon that commerce directly enough to be within the scope of the power. Here transportation is directly enough regulated, but it must be itself interstate, for the situation is not one where it is essential to include intrastate rates as inextricably interwoven with interstate. In the second and third classes mentioned above one leg of the journey is in fact interstate, one terminus is in another state than Cadosia; therefore, as we have already said, the question is how closely it is bound to the other leg, which is wholly intrastate. Do the two coälesce for rate-making purposes? We may start by excluding extremes; on the one hand, pauses in transit, interpolated only for the more convenient prosecution of the journey, do not break the continuity of the transportation. Kelley v. Rhoads, 188 U.S. 1, 23 S.Ct. 259, 47 L.Ed. 359; Texas & N. O. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442; Champlain Realty Co. v. Brattleboro, 260 U.S. 366, 43 S.Ct. 146, 67 L.Ed. 309, 25 A.L.R. 1195; Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359; Carson Petroleum Co. v. Vial, 279 U.S. 95, 49 S. Ct. 292, 73 L.Ed. 626; U. S. v. Erie R. Co., 280 U.S. 98, 50 S.Ct. 51, 74 L.Ed. 187. On the other hand the movement of one article cannot be pieced upon that of a wholly different article; for example, a joint rate could not be fixed for the journey from the mine to the consumer,

though the iron content of the ore could be identified in a fabricated steel girder. The test of identity must be industrial, not material, for the values at stake are economic. Midway between these are delays at depots of sale, which break the journey enough to allow the goods to be taxed locally. General Oil Co. v. Crain, 209 U.S. 211, 28 S.Ct. 475, 52 L.Ed. 754; Bacon v. Illinois, 227 U.S. 504, 33 S.Ct. 299, 57 L.Ed. 615 (where there was the additional circumstance of a change in the commercial value of the article); Minnesota v. Blasius, 290 U.S. 1, 54 S.Ct. 34, 78 L.Ed. 131. These cases are not as conclusive here, however, as might be hoped, because of the intimation, if no more, that the power of Congress to regulate may not end where that of the States to tax begins. American Steel & Wire Co. v. Speed, 192 U.S. 500, 521, 522, 24 S.Ct. 365, 48 L.Ed. 538; Swift & Co. v. U. S., 196 U.S. 375, 399, 25 S.Ct. 276, 49 L.Ed. 518; Superior Oil Co. v. Mississippi, 280 U.S. 390, 395, 50 S.Ct. 169, 74 L.Ed. 504. Yet there are instances where, so far as we can see, a break in the journey at a selling depot was alone thought to be enough to break a continuous journey and submit the transportation to local regulation. Chicago, M. & St. P. R. Co. v. Iowa, 233 U.S. 334, 34 S.Ct. 592, 58 L.Ed. 988; Atlantic Coast Line Ry. Co. v. Standard Oil Co., 275 U. S. 257, 48 S.Ct. 107, 72 L.Ed. 270. So far as Railroad Comm. of Ohio v. Worthington, 225 U.S. 101, 32 S.Ct. 653, 56 L.Ed. 1004, decided otherwise, it must be deemed overruled. The only other decision which seems to us difficult to reconcile is Southern Pac. Terminal Co. v. Interstate Commerce Comm., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310, where not only did part of the goods apparently wait at Galveston for sale, but all the cake was ground into meal at that place. Even so, there was a part,—that is, the meal which was consigned to fill existing contracts when it left the interior,—whose journey was interrupted only by delays in forwarding, as was true in Texas & New Orleans Ry. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S. Ct. 229, 57 L.Ed. 442. Over so much the Commission certainly had jurisdiction, and it was enough to upset Young's lease of the pier. However, apparently the Commission's order subjected all his business to interstate rates and therefore the whole decision cannot be so explained. Moreover, when it was discussed in Texas & New Orleans Ry. Co. v. Sabine Tram Co.,

supra, 227 U.S. 111, at page 125, 33 S.Ct. 229, 57 L.Ed. 442, the grinding of the cake was spoken of as "manufacture," which perhaps it was. It may therefore be that, if this decision stood alone, we should have to say that even a combination of manufacture and a temporary stop at a selling depot would not break the journey.

It does not stand alone. Not only did the two cases which we have mentioned, Chicago, M. & St. P. Ry. v. Iowa, 233 U.S. 334, 34 S.Ct. 592, 58 L.Ed. 988, and Atlantic Coast Line Ry. Co. v. Standard Oil Co., 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270, come later, but Arkadelphia Milling Co. v. St. Louis Southwestern Ry. Co., 249 U.S. 134, 39 S.Ct. 237, 63 L. Ed. 517, far and away the closest of any to the facts at bar, contradicts it, if it stands for so broad a result. True, the pause was there much longer than here,—five months to season the lumber,—but that we conceive to be of minor consequence. The determining factor, as we take it, was that the raw material was made into a new article at the stop; it can hardly have been crucial how long that took, though undoubtedly the length of time required was striking. Now manufacture itself, with exceptions not here pertinent, is a domestic activity beyond the power of Congress; if an intrastate movement, before or after it, be treated as part of a later or earlier interstate movement, it is difficult to avoid bringing nearly all transportation within the compass of the power. The constituents of most goods must be assembled, and the goods themselves must in turn be distributed; very few could be found, no element of which crossed a state line or was imported, from its origin as raw material till it reached the consumer, embodied in the end product. We need not say categorically that every activity which can be classed as part of manufacture must inevitably interrupt an interstate movement; the phrase has not such hard outlines; like most legal concepts its fringes are uncertain and its contours evade precise definition, being a creature of colloquial speech and of the compromise of conflicting interests. We do say, however, that the creation of an article of commerce, as distinct from the packing, bailing and the like of an existing one, will generally be a terminus of transportation, and that here there is no reason to import an exception. It is common to call the question one of fact; and conventionally it may be so, just

as negligence is called a question of fact. But strictly it is not; we are after a standard, and because the law does not furnish an express one, we ought not disguise what we do by a misleading mask, even though that is especially comforting, where as here the standard is elastic and the decision must in substance be a choice. In such cases it may preserve an appearance of dialectic to call the question one of fact, but the question is none the less one which we can and must review.

The Commission has suggested that the result we have reached might have far reaching effects upon the practice of granting "transits." That fear seems to us unwarranted; all interstate transportation, which is really such, will remain unaffected; "transits" will be as lawful as before. It is true that under their guise it will not be possible to treat movements as interstate which are not really such; but nobody, so far as we can find, supposes that that has ever been possible; and it would have been plainly a mistake if he had. "Transits" are lawful enough within the limits of the federal power, but they cannot be used as a constitutive element of that power.

The plaintiffs may take the injunction which they ask. Let them propose findings of fact and conclusions to be submitted to the defendant five days before they are presented to the court. The defendants may present any corrections and supplements.

Decree for the plaintiffs.