Bob ROBERTS, d/b/a Bob Roberts Trucking, Appellant,

v.

Leonard W. LEVINE, Commissioner of Transportation of the State of Minnesota, Appellee.

No. 90–5023MN.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1990.

Decided Dec. 26, 1990.

Kelton Gage, Mankato, Minn., for appellant.

Gordon L. Moore III, St. Paul, Minn., for appellee.

Before WOLLMAN and MAGILL, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.

MAGILL, Circuit Judge.

Bob Roberts, d/b/a Bob Roberts Trucking, appeals the district court's order granting summary judgment for Leonard W. Levine, Minnesota's Commissioner of Transportation, in Roberts' declaratory action to determine whether he was engaged in interstate commerce when Minnesota cited him for transporting grain and urea, a nitrogen-based fertilizer, without a state permit. Roberts argues that his intrastate transport of the goods was one part of an interstate journey governed by the motor carrier provisions of the Interstate Commerce Act, 49 U.S.C. §§ 10101–11914 (1988), which preempts state jurisdiction. We affirm in part and reverse in part.

I.

A. Stipulated Facts [1]

Bob Roberts, d/b/a Bob Roberts Trucking, is engaged in the business of trucking grain, fertilizer, and other commodities. His principal place of business is Sleepy Eye, Minnesota. Roberts holds Interstate Commerce Certificate No. MC–163522 (Sub–No. 2), which provides him with irregular route authority to engage in interstate commerce. Roberts holds no certificate or permit from the State of Minnesota to operate a motor carrier for hire in intrastate commerce in the State of Minnesota.

Leonard W. Levine is the Commissioner of Transportation of the State of Minnesota with responsibility, among other things, to enforce the provisions of Minn.Stat.Ch. 221, including Minn.Stat. §§ 221.021, .291(4) (1988). Those provisions make it a misdemeanor for any person to operate as a motor carrier for hire in intrastate commerce in the State of Minnesota without a certificate or permit from the State of Minnesota in full force and effect.

On August 22, 1986, Roberts transported a shipment of urea fertilizer from the Pine Bend warehouse of CF Industries in Inver Grove Heights, Minnesota, to the Sleepy Eye Elevator. Roberts' route from the Pine Bend warehouse to Sleepy Eye was entirely within the State of Minnesota. Roberts was hired and paid by the Sleepy Eye Elevator to perform that act of transportation.

On September 8, 1986, Roberts transported a shipment of soybeans from the Sleepy Eye Elevator to a soybean processing plant in Mankato, Minnesota, owned and operated by Archer Daniels Midland (ADM). Again, Roberts' route from Sleepy Eye to Mankato was entirely within the State of Minnesota and Roberts was hired and paid by the Sleepy Eye Elevator to perform that act of transportation.

On November 12 and 13, 1986, Roberts transported shipments of soybeans from the Sleepy Eye Elevator to a soybean processing plant in Mankato, Minnesota, owned and operated by Honeymead Products Company (Honeymead). This route was entirely within the State of Minnesota and Roberts was hired and paid by the Sleepy Eye Elevator to perform those acts of transportation.

At the instance of an authorized delegate of the Commissioner of Transportation, the State of Minnesota issued a criminal misdemeanor complaint against Roberts alleging that Roberts' transportation of urea fertilizer from the CF Industries Pine Bend warehouse to the Sleepy Eye Elevator and Roberts' transportation of soybeans from the Sleepy Eye Elevator to the ADM and Honeymead soybean processing plants in Mankato, Minnesota, each constituted unlawful operation as a motor carrier for hire without a permit or certificate in effect in violation of Minn.Stat. §§ 221.021, .291(4) (1988).

1. The parties have stipulated to the following facts, which the district court adopted as its findings of fact and which we adopt for purposes of this appeal.

*Urea*

CF Industries, Inc. (CF) is a corporation owned by fifteen Canadian and United States cooperatives, including Cenex/Land O'Lakes (Cenex). The various cooperatives which own CF are, in turn, composed of smaller member cooperatives. The Sleepy Eye Elevator is a member cooperative of Cenex. Cenex has other member cooperatives in Minnesota and in North and South Dakota, Montana, Iowa and Wisconsin.

CF manufactures and distributes phosphate fertilizer and nitrogen fertilizer (urea). CF sells these products only to its owner cooperatives such as Cenex. CF, together with various Canadian farm cooperatives, owns a plant for the production of urea at Medicine Hat, Alberta, Canada. CF also produces urea at a plant owned and operated by it in Donaldsonville, Louisiana.

Urea is sold to member cooperatives and shipped from the Pine Bend warehouse in the following manner. When a local cooperative elevator (here, the Sleepy Eye Elevator) decides to purchase urea, it contacts its parent cooperative (here, Cenex). After the Sleepy Eye Elevator's order is received by Cenex at its headquarters in Inver Grove Heights, Minnesota, Cenex transmits the order to CF's central distributing office in Long Grove, Illinois. The Long Grove, Illinois office notifies the Pine Bend warehouse that Cenex wishes to purchase a certain amount of urea on a certain date. This information is transmitted by a computer data link between the Long Grove, Illinois office and the Pine Bend warehouse. A bill of lading for the transportation of urea from the Pine Bend warehouse to Cenex is then generated by machine at Pine Bend. This bill of lading shows CF as the consignor and Cenex's Sleepy Eye Elevator as the consignee. All urea is shipped from Pine Bend, f/o/b Pine Bend. Sleepy Eye Elevator pays all of the shipping charges to transport the urea from Pine Bend to its own elevator, and hires the carrier, in this case, Roberts. After shipment of the product, the Pine Bend warehouse adjusts its inventory and transmits the shipping information by computer data link to Long Grove, which then automatically generates an invoice to Cenex. CF's central distributing office in Long Grove also uses this shipping information to keep track of the inventories at the various CF warehouses, including Pine Bend.

Urea is shipped by rail prepaid from Medicine Hat to the Pine Bend warehouse. Such shipments are intra-company transfers, even if made in response to the request of a member cooperative for more inventory. For each such shipment, Medicine Hat generates a bill of lading to Pine Bend, indicating, among other things, the tonnage being sent, and a copy of such bill of lading goes to the Long Grove, Illinois office. The bill of lading is used as an inventory control document both for Pine Bend and for the Long Grove, Illinois office, which has an on-line computer hookup to Pine Bend. The inventory is updated daily, and CF's distribution department at Long Grove is in communication with the Medicine Hat plant and with the warehouse at Pine Bend three or four times per day. The distribution center adjusts inventories by moving product to the warehouse when necessary.

CF has elected to create and maintain facilities for the storage of urea at various warehouses throughout the United States such as Pine Bend rather than at its plant in Medicine Hat. CF ships urea from Medicine Hat to Pine Bend for one of two purposes: to provide for more production room at the Medicine Hat plant or to refill the Pine Bend warehouse. Upon request of an owner coop, CF ships directly to member cooperatives that have facilities to unload rail cars. Otherwise, CF does not know where the urea it sends to Pine Bend will ultimately be shipped.

The Pine Bend warehouse has a capacity to store 40,000 tons of urea. In the course of a one-year period, CF sells approximately 100,000 tons of urea from the Pine Bend warehouse. Accordingly, the urea inventory of the Pine Bend warehouse turns over approximately 2½ times per year.

Urea can be stored indefinitely. Urea shipped from Medicine Hat to the Pine Bend warehouse may remain at the Pine

Bend warehouse for as long as six months. In other cases, a given shipment of urea from the Medicine Hat warehouse may remain at the Pine Bend warehouse for as little as one or two months.

Peak demand for urea from the Pine Bend warehouse and peak sales of urea from the Pine Bend warehouse occur in the spring of each year during planting season. There is a smaller peak in the late summer and fall when CF offers incentive prices to its member cooperatives to encourage them to buy urea, and owner cooperatives restore their own inventories for sales in the fall and the following spring.

In years when demand for urea is relatively low, CF, on its own or in conjunction with one or more of its member cooperatives, may have what is called a "fill program." This means that during relatively slow times, CF offers to its member cooperatives, and its member cooperatives may, in turn, offer to their own local members, a lower price on urea, if the buyer will buy a large quantity and store it for the coming year. This is a way of stocking up for the next year when demand is expected to be higher. It is also a way to empty the warehouse so that more product may be moved from the Medicine Hat plant.

Urea sold from Pine Bend is not allocated among the member cooperatives unless there is a shortage of fertilizer in a given year. For a short period in 1986, urea was allocated among member cooperatives, including Cenex.

The limitation of CF urea sales only to its own member cooperatives is subject to the following exception: CF has a small exchange program with other fertilizer companies to which it might sell in a typical year between five and six thousand tons of fertilizer from the Pine Bend warehouse out of an annual distribution of 100,000 tons of urea from the Pine Bend warehouse. Pursuant to this program, no money changes hands. Rather, fertilizer credits are simply exchanged.

Some urea is shipped directly from the Medicine Hat plant to member cooperatives that have rail facilities and sufficient storage to handle rail carload shipments. The remaining member cooperatives must receive urea by truck from a warehouse. The Pine Bend warehouse receives virtually all of its urea by rail and ships virtually all of it by truck. There are no rail movements of urea out of Pine Bend.

CF has an annual "demand strategy" whose purposes are to maintain a steady rate of urea production at its plants and to maintain an adequate inventory of its warehouses. In September and October of each year, CF begins to prepare a marketing plan to determine how much fertilizer member cooperatives will need in the following year. Each year's plan is based, in the first instance, on the volume of shipments from the Pine Bend warehouse in the previous year. In addition, representatives of the CF central distributing office in Long Grove, Illinois contact each member cooperative to obtain a forecast of sales for the coming year. This is an estimate, and is updated throughout the year and may be changed a number of times, depending on the demand that the member cooperative has for fertilizer and what kind of year it is for agriculture. The marketing plan does provide CF with an estimate of anticipated demand to enable the plants to produce at a steady rate and to keep Pine Bend and CF's other warehouses full.

CF has no supply contracts with any of the member cooperatives, nor are the owner cooperatives required to accept specific quantities of urea. If urea demand drops, the Medicine Hat plant would continue sending urea to Pine Bend so long as Pine Bend had capacity to receive it. If the Pine Bend warehouse were filled with urea received from Medicine Hat, CF would sell the Donaldsonville product on the export market.

The Pine Bend warehouse does not process or alter the urea in any way. It is received in bulk in railroad cars and shipped in bulk in trucks.

*Soybeans*

Honeymead is engaged in the daily cash bids business of processing raw soybeans into soybean meal and crude soybean oil and in the business of refining crude soy-

bean oil into various grades of refined soybean oil. In purchasing soybeans, it is Honeymead's practice to make a daily cash bid per bushel of delivered beans. The daily cash bid is communicated by a combination of posting, publication on an electronic mail system, and through a series of afternoon telephone calls to local sources of raw soybeans. In accordance with its daily cash bids, Honeymead then enters into contracts with country elevators and other sources of soybeans in Southern Minnesota, eastern North and South Dakota, and northern Iowa. These contracts provide for the delivery of a stated quantity of soybeans at a stated time and for a stated price.

The soybeans purchased by and shipped to Honeymead's Mankato processing plant may be grown in Minnesota, North or South Dakota, or Iowa. The particular soybeans transported by Roberts from the Sleepy Eye Elevator were grown in Minnesota. Eighty percent of the soybeans arrive by truck, and the remainder arrive by rail.

Typically, a country elevator selling soybeans to Honeymead hires the carrier and pays for their shipment to Honeymead's Mankato processing plant. In this case, the Sleepy Eye Elevator hired Roberts to transport the soybeans to Honeymead.

All of the soybeans received at the Honeymead plant are processed into soybean meal and crude soybean oil. All of the resulting crude soybean oil is then refined by Honeymead into various grades of refined soybean oil. No soybeans are transported from Honeymead's Mankato plant. When any given shipment of soybeans is received at the Honeymead plant, it either goes directly into processing or into a storage bin.

Honeymead has the capacity to store an amount of soybeans sufficient for sixty days of processing operations. The amount of soybeans on hand at any given time depends upon Honeymead's estimation of the trend of soybeans, soybean oil, and soybean meal prices and ranges over the course of a year from a three-day supply to a sixty-day supply. Typically, the amount of soybeans on hand will be in the range of a twenty- to thirty-day supply.

Honeymead processes soybeans by the following steps. The soybeans are first heated, next dried, and then put into a "quick cool" environment which causes the hulls to crack off. The hulless soybeans are then put into a "cracker" and are further cracked and rolled into flakes. The soybean flakes are then put into a hexane solvent mixture which floats out the oil. The hexane and crude soybean oil are then recovered. The soybean flakes with the oil removed are then toasted and dried and finally ground into meal. Soybean meal is used for animal feed.

Honeymead also refines crude soybean oil. Because Honeymead's soybean refining capacity exceeds its soybean processing capacity, it not only refines all of the crude soybean oil which it extracts, but also purchases crude soybean oil from ADM and other soybean processors.

Honeymead produces and sells between thirty and forty different types of refined soybean oil in the following categories: "once refined oil," alkali refined oil, salad oil, various grades of hydrogenated oil, and various blends thereof. As a byproduct of the refining process, Honeymead also produces lecithin and soapstock.

Once refined oil and alkali refined oil are used primarily in the production of various paints and other coatings, ink, and plastics. Salad oil is used in the production of various human food products. Hydrogenated oil is used primarily in the manufacturing of shortening and margarine. Lecithin is used in the production of paints and other coatings and is also used in milk replacers, candy, and other food products. Soapstock is used primarily as an animal feed additive.

Briefly put, and depending upon the particular type of refined oil sought to be produced, Honeymead refines crude soybean oil through the following steps: centrifuging; caustic wash; bleaching; various filtering processes; vacuum/high temperature deodorizing; and a hydrogenation process (for hydrogenated oil).

When any given shipment of raw soybeans is brought into the facility, the oil or meal to be processed from those soybeans may or may not have already been sold, depending upon the time of year. Honeymead's storage capacity for refined products is one day's meal production and ten days' oil production. Typically, the meal and oil to be produced for the next thirty days are sold on the futures market. Honeymead typically sells refined oil in pound lots and typically sells meal by the short ton.

Of the soybean meal produced at Honeymead's Mankato plant, approximately seventy percent is shipped out of Minnesota with the remaining thirty percent shipped to destinations within the State of Minnesota. The majority of the soybean meal is shipped from the Mankato plant by truck, the balance by rail or barge.

Approximately seventy percent of the refined soybean oil produced by Honeymead at its Mankato facility is shipped to destinations outside Minnesota. The thirty percent which remains in Minnesota goes primarily to margarine manufacturers. Much of the resulting margarine is shipped in interstate commerce. The oil is shipped f/o/b Mankato, except for oil delivered in Honeymead's own tank cars, which are billed f/o/b destination. Shipments of soybean oil from Honeymead's Mankato plant are split evenly between truck and rail.

Like Honeymead, ADM also has a soybean processing plant at Mankato, Minnesota. ADM processes soybeans into soybean meal and unrefined soybean oil by a process similar to that used by Honeymead. ADM buys soybeans over the southern third of Minnesota and the northern third of Iowa and in eastern North and South Dakota. The particular soybeans transported by Roberts from the Sleepy Eye Elevator were grown in Minnesota.

Typically, ADM buys the soybeans f/o/b Mankato. In about ten percent of the cases, ADM arranges transportation and prices the soybeans f/o/b point of shipment.

The soybeans are transported to ADM by truck and rail with about eighty-five percent coming by truck and fifteen percent by rail. ADM can store sufficient soybeans for approximately ten days' processing. Typically, soybeans are processed within two to five days after arrival.

ADM sells soybean meal and crude soybean oil for future delivery on established markets and then buys beans for future delivery to cover the product sold. Typically, ADM produces meal and oil to fill contracts already in existence. Meal usually leaves the plant within two to three days after processing. Meal storage capacity is approximately five days. Most of the meal is trucked to its destination. ADM has the capacity to hold forty to sixty million pounds of oil. Typically, ADM produces one to two million pounds per day.

The soybean meal produced by ADM is used entirely for animal feed, particularly for turkey and swine and, in Wisconsin, for dairy cattle. Fifty percent of the meal is used in Minnesota. The remaining fifty percent goes to Canada and states adjacent to Minnesota.

Ninety-nine percent of the crude soybean oil is sent to other plants for further refining. One percent of the crude oil is used for animal feed unrefined. Honeymead of Mankato buys sixty to seventy-five percent of the crude oil. The remainder goes to ADM's refining plants in Des Moines, Iowa, and Lincoln, Nebraska, with a smattering going to other refiners. Most of the oil sold by ADM moves by rail, although some is trucked to Honeymead and a small amount is trucked to ADM's Des Moines and Lincoln refining plants.

ADM accumulates the soybean hulls from the processing and sells them for animal feed. The hulls are sent to Minneapolis where about ninety-five percent of them are transshipped to New Orleans, Louisiana, by barge. ADM processes all of the raw soybeans received by it at its Mankato facility in the production of soybean meal and crude soybean oil. No soybeans are transported from ADM's Mankato plant to any other destination.

## B. Procedural History

After the state cited Roberts for three counts of illegal carriage for hire, he filed an action in federal district court alleging that Minnesota's enforcement of its motor carrier laws against him unreasonably burdened interstate commerce and violated the Interstate Commerce Act. Levine, who was substituted for the State of Minnesota, asserted that each of the cited acts involved wholly intrastate commerce, and that therefore Roberts was subject to state jurisdiction. Roberts also sought to enjoin the state criminal proceedings against him, but withdrew this claim after the state deferred the criminal charges. The state also waived its right to request the district court to abstain. Both parties filed motions for summary judgment.

On December 27, 1989, the district court filed an order granting Levine's motion for summary judgment. The district court held that the shipments at issue constituted intrastate commerce, and that Roberts thus was subject to Minnesota's regulatory authority. Roberts now appeals this ruling.

## II.

### A. The Urea Shipment

■ Roberts first contends that the district court erred in holding that his transportation of urea constituted intrastate commerce, and that he thus was subject to Minnesota's regulatory authority. In reaching its decision that Roberts was engaged in intrastate commerce, the district court treated as controlling *Atlantic Coast Line R.R. v. Standard Oil Co.*, 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927), where the Supreme Court held that the intrastate transport of imported oil from coastal storage facilities to inland bulk stations constituted intrastate commerce. *Id.* at 273, 48 S.Ct. at 112. In that case, the Standard Oil Company of Kentucky maintained oil tanks and warehouses in Florida. Standard purchased oil from various refiners who transported the oil by sea to the Florida storage facilities. Title to the oil did not pass to Standard until after the oil had been delivered. Standard then transported the oil by rail and motor carrier to its 123 bulk stations throughout Florida. These bulk stations serviced the oil needs of Standard's Florida customers. The issue in the case was whether Standard's reshipment of the oil to its bulk stations was inter- or intrastate commerce for the purpose of determining the applicable shipping rates. The Supreme Court began its analysis by stating that to determine whether commerce is inter- or intrastate, courts must analyze "the essential character of the commerce," *id.* at 268, 48 S.Ct. at 110, and that this character must be determined by examining the facts. *Id.* at 269, 48 S.Ct. at 110–11. The Court then stated: "The important controlling fact in the present controversy, and what characterizes the nature of the commerce involved, is that [Standard's] whole plan is to arrange deliveries of all of its oil purchases on the seaboard of Florida so that they may all be there stored for convenient distribution in the state...." *Id.* The storage facilities, the Court believed, were the "natural places for a change from interstate and foreign transportation to that which is intrastate, and there is nothing in the history of the whole transaction which makes them otherwise, either in intent or in fact." *Id.* The Court concluded: "We have no hesitation in saying that the nature of the commerce in controversy in this case was intrastate." *Id.* at 270, 48 S.Ct. at 111.

Although the language and facts present in *Atlantic Coast Line* appear to make the case relevant, close examination reveals its inapplicability to the case before us. One distinguishing fact is that in this case, CF Industries, through Cenex, is both the shipper and the owner of the warehouse. Thus, it has title to the urea before the urea is shipped to the warehouse and after it arrives there. This ties in to the more crucial distinguishing fact, namely, that in this case CF intends the urea to go beyond the Pine Bend warehouse to its member cooperatives in the various states. In *Atlantic Coast Line*, the situation was vastly different: "There is nothing to indicate that the destination of the oil is arranged for or fixed in the minds of the sellers beyond the primary seaboard storag-

es...." 275 U.S. at 269, 48 S.Ct. at 111. The Court noted that neither the sellers that shipped the oil nor the railroad company that delivered the oil to the storage facilities had any involvement with determining the oil's ultimate destination. *Id.* Here, it is CF that determines and controls the final delivery of the urea to the member cooperatives. For these reasons, *Atlantic Coast Line* does not control our decision in this case.

The district court also found *Baird v. Wagoner Transp. Co.*, 425 F.2d 407 (6th Cir.), *cert. denied*, 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970), instructive. Levine relies heavily on this case. The facts in *Baird* are similar to those before us. In *Baird*, Standard Oil shipped petroleum products from out-of-state to a terminal in Muskegon, Michigan, according to "sophisticated" forecasts of its Michigan customers' needs. All customer orders were placed with Standard's sales department, which informed the terminal's manager and the shipper of the quantities and destinations of the deliveries. Although there was no evidence of the average amount of time the petroleum products were warehoused, the terminal's through-put rate was about six times its capacity. Standard had more than 200 customers in Michigan. Some customers ordered by means of requirements contracts, some called each time they wanted an order, some ordered regularly, and some ordered irregularly. Even though Standard knew the identities of its Michigan customers, it did not know exactly the amount of petroleum products each customer would order when it shipped the products to Muskegon.

The Sixth Circuit applied a three-part test to determine whether the shipments from the Muskegon terminal to the Michigan customers constituted intrastate or interstate commerce. It borrowed this test from the Interstate Commerce Commission's (ICC) decision in *Ex Parte No. MC–48,* 71 M.C.C. 17 (1957). The *Baird* court stated that in *Ex Parte No. MC–48,* the ICC

> specifically indicated that truck drivers are not engaged in "interstate commerce" ... and not subject to the juris-

diction of the Commission where the following three factors are present: (1) "specific orders" of a "specific quantity" are not moved from one state through the terminal storage of a second state to a specific customer; (2) the use of the terminal storage as a "local marketing facility" from which products are "sold or allocated;" and (3) transportation in furtherance of such "distribution within a single state is specifically arranged only after sale or allocation from storage."

*Baird,* 425 F.2d at 411. The Sixth Circuit found these factors present in the case before it. Even though Standard knew the identities of its customers, the specific quantity of petroleum products to be shipped to a certain destination was not known at the time the petroleum was shipped to Muskegon. *Id.* The court found that although the terminal did not process petroleum or make retail sales, it was a "local marketing facility" because its through-put rate was only six times its storage capacity and the products at the terminal were "inventory-in-store" for orders to be placed later. *Id.* The court also determined that no final shipping arrangements were made until after the petroleum products were stored at Muskegon because the forecasts the terminal received were not specific orders, only estimates. *Id.* at 411–12. Based on the presence of the three factors, the *Baird* court held that Standard's intrastate shipments constituted intrastate commerce.

It is not possible to distinguish *Baird* from the case before us. Were *Baird* the only mark on an otherwise blank slate, we might have adopted its analysis, but because two recent circuit court decisions have made it clear that the test used in *Baird* is outmoded, we decline to adopt its three-part test. These decisions are *California Trucking Ass'n v. I.C.C.,* 900 F.2d 208 (9th Cir.1990), *aff'g The Quaker Oats Co.,* No. MC–C–30006 (I.C.C. Aug. 10, 1987), and *Central Freight Lines v. I.C.C.,* 899 F.2d 413 (5th Cir.1990), *aff'g Victoria Terminal Enters., Inc.,* No. MC–C–30002 (I.C.C. Jan. 27, 1989). In both cases, par-

ties disgruntled by ICC orders in interstate-intrastate controversies challenged the orders as arbitrary and capricious deviations from prior standards. In *California Trucking*, a trucking association contended that the standard the ICC applied in its *Quaker Oats* decision was not consistent with controlling precedent. 900 F.2d at 211. It specifically argued that "in cases involving out-of-state shipper warehousing and distribution operations, the ICC and the courts have employed [the *Ex Parte No. MC–48*] three-part test to determine the essential nature of the commerce." *Id.* The trucking association urged that abandoning the test was unreasonable as a matter of law, and that failing to apply or explain it was arbitrary and capricious. *Id.* at 212. Similarly, in *Central Freight*, a shipper challenged the ICC's order in *Victoria Terminal* on the ground that the ICC did not use the *Ex Parte No. MC–48* test. 899 F.2d at 421.

In both cases, the circuit courts held that the ICC did not act arbitrarily or capriciously in failing to use the *Ex Parte No. MC–48* test. *California Trucking*, 900 F.2d at 213; *Central Freight*, 899 F.2d at 423. About the current validity of the test, the Ninth Circuit specifically stated: "Even though the ICC has never explicitly stated that it was abandoning the more structured *Ex Parte No. MC–48* test, it appears that its use of that standard has been refined, if not phased out." *California Trucking*, 900 F.2d at 213. The Fifth Circuit reached the same conclusion, stating that the ICC "appears to have implicitly recharacterized the applicable test." *Central Freight*, 899 F.2d at 421.

The current test the ICC uses to determine whether intrastate transportation constitutes interstate commerce dates back to its 1986 decision in *Armstrong World Indus., Inc.*, 2 I.C.C.2d 63, 69 (1986), *aff'd*, *Texas v. United States*, 866 F.2d 1546 (5th

Cir.1989). *See Middlewest Motor Freight Bureau v. I.C.C.*, 867 F.2d 458, 460 (8th Cir.), *cert. denied sub nom. Missouri Div. of Transp. v. I.C.C.*, —— U.S. ——, 110 S.Ct. 234, 107 L.Ed.2d 185 (1989). A recent ICC decision, *The May Dep't Stores Co. & Volume Shoe Corp.*, No. MC–C–30146 (I.C.C. June 7, 1990), [1990] 3 Fed.Carr.Cas. (CCH) ¶ 37,823, contains the current test's standard formulation:

> It is well settled that the determination of whether transportation between two points in [a] State is interstate (or foreign) or intrastate in nature depends on the "essential character" of the shipment.... Crucial to this determination is the shipper's fixed and persisting intent at the time of shipment.... Intent is ascertained from all the facts and circumstances surrounding the transportation.

*Id.* at 47,204 (citations omitted); *accord Pittsburgh–Johnstown–Altoona Express, Inc.*, No. MC–C–30129 (I.C.C. Feb. 6, 1990), [1990] 3 Fed.Carr.Cas. (CCH) ¶ 37,795, at 47,110; *Ottawa Strong & Strong, Inc.*, No. MC–C–30076 (I.C.C. March 1, 1989) [1988–89] 3 Fed.Carr.Cas. (CCH) ¶ 37,656, at 47,779; *Bigbee Transp., Inc.*, No. MC–C–30065 (I.C.C. Oct. 26, 1988) [1988–89] 3 Fed.Carr.Cas. (CCH) ¶ 37,573, at 47,575; *James River Corp.*, No. MC–C–30044 (I.C.C. July 6, 1988) [1988–89] 3 Fed.Carr. Cas. (CCH) ¶ 37,506, at 47,380. Both the Ninth and the Fifth Circuits have approved the ICC's use of the current test, finding it to be reasonable and consistent with the rationale of older cases.[2] *See California Trucking*, 900 F.2d at 213; *Central Freight*, 899 F.2d at 421.

The ICC has primary responsibility over issues such as the ones presented in this case. *See Service Storage & Transfer Co. v. Virginia*, 359 U.S. 171, 173, 79 S.Ct. 714, 715–16, 3 L.Ed.2d 717 (1959); *Middlewest*

---

2. This court has affirmed one ICC interstate-intrastate determination using the current standard. *See Middlewest Motor Freight Bureau v. I.C.C.*, 867 F.2d 458, 460 (8th Cir.), *aff'g Matlack, Inc.*, No. MC–C–10999 (I.C.C. June 1, 1987), *cert. denied sub nom. Missouri Div. of Transp. v. I.C.C.*, —— U.S. ——, 110 S.Ct. 234, 107 L.Ed.2d 185 (1989). The scope of our review in *Mid-dlewest* was limited to whether or not the ICC's determination that Matlack was engaged in interstate commerce was arbitrary, capricious, an abuse of discretion, or unsupported by substantial evidence. Thus, we did not discuss the current standard other than to recognize the ICC's use of it.

*Motor Freight,* 867 F.2d at 459. "Because the ICC is the agency invested with responsibility for making determinations about the essential nature of commerce and should have some latitude in evolving standards that keep up with the times," *California Trucking,* 900 F.2d at 213, we decline to apply the three-part test from *Ex Parte No. MC–48,* and adopt for purposes of this appeal the current ICC test to determine whether Roberts' intrastate transportation of urea constituted interstate commerce.

To reiterate, the critical inquiry is whether CF Industries had the fixed and persisting intent to transport the urea beyond the Pine Bend warehouse when it originally shipped the urea from Canada. A review of ICC decisions that employ the current test clearly shows that Roberts' intrastate transportation of urea constituted interstate commerce. In *May Department Stores,* the shipper imported goods that arrived in Los Angeles and Long Beach, California. The shipper then transported the goods to a Los Angeles warehouse, where the goods were prepared for delivery to the shipper's retail outlets. The goods did not remain at the warehouse for longer than two weeks. When the products were initially shipped to Los Angeles, the shipper did not know the ultimate destinations for thirty percent of them. On these facts, applying the current test, the ICC found that the intrastate transportation to the warehouse was interstate commerce. [1990] 3 Fed.Carr.Cas. at 47,205. The ICC stated:

> While there is some dispute on the movements involving destinations that are determined only after [goods] arrive at the distribution center, there appears no logical reason to view this traffic differently [than traffic where the destination is known before shipment]. The parties have cited no recent supporting precedent for such a distinction. The shipper's intent that these items move beyond the [warehouse] to its stores is as fixed as it is for [shipments with known destinations].

*Id.* The ICC also stressed the fact that the shipper controlled the purchase, shipment, and sale of the goods. *Id.*

The ICC reached a similar result in *Pittsburgh–Johnstown.* In that decision, the relevant facts established that the shippers maintained distribution centers in Pennsylvania to which they transported out-of-state goods for eventual distribution to their Pennsylvania customers. These goods had not been consigned to any customer at the time they were shipped; delivery to the distribution center was based on supply contracts and predictions of customer need. The shippers owned the distribution centers and arranged the shipments to and from the centers. They used the distribution centers to increase their efficiency and better meet customer demand. On these facts, the ICC determined that all of the goods arriving at the distribution centers were destined for subsequent movement and thus that the intrastate transport constituted interstate commerce. [1990] 3 Fed.Carr.Cas. at 47,111. The ICC considered as crucial the facts that the shippers owned the centers and controlled the shipments. *Id.* If another party had arranged the inbound shipment, the ICC expressly noted, the subsequent transport would have been intrastate. *Id.* n. 10. As in *May Department Stores,* that the shipper did not know the exact identity of the customer at the time of initial shipment did not prevent the subsequent intrastate shipment from constituting interstate commerce.

In *Ottawa Strong,* the ICC held that an intrastate shipment constituted interstate commerce where the shippers controlled the transportation to and from the warehouse, expressed their intent that the intrastate transport was one leg of an interstate journey, and made the shipments *"pursuant to the past ordering practices of the dealers and their projected future demands for products."* [1988–89] 3 Fed. Carr.Cas. at 47,780 (emphasis added).

Finally, in *Bigbee Transportation,* the ICC found an intrastate shipment to be interstate commerce where the shipper did not know the exact destination for goods

that it purchased out of state, but based its intrastate shipments on estimated need for the good. [1988–89] 3 Fed.Carr.Cas. at 47,-576. The ICC stated: "The fact that [the Department of Defense] orders fuel based on known airfield needs shows its intention from the outset to move the product beyond the terminal to other points in the State." *Id.* The facts showed that fuel was shipped to the warehouse by pipeline governed by one bill of lading, and then was shipped by truck to its final destination governed by a second bill of lading. The ICC determined that separate bills of lading did not preclude a finding of interstate commerce where different carriers and modes of transportation were involved. *Id.* The ICC also observed: "The fact that DOD's fuel may be temporarily stored does not destroy the continuity of the single interstate movement." *Id.*

The facts in the case before us are strikingly similar to the facts in these recent ICC decisions. Here, CF Industries, through Cenex, controls the production, shipment, and subsequent sale of the urea. Although CF does not know the exact quantity of urea that each individual customer will receive when it ships urea to the Pine Bend warehouse, it makes these shipments on the basis of past demand and estimated future need. CF does store the urea at Pine Bend, but the storage is only temporary. This storage serves to facilitate CF's distribution of urea because where CF can deliver urea directly to its customers, it does so. But only a few have rail facilities, and therefore CF must deliver the rest of the urea by truck. These facts all indicate CF had the fixed and persisting intent to ship the urea beyond Pine Bend and therefore that Roberts' intrastate transportation of urea was one leg of an interstate journey.

Levine argues that other facts indicate intrastate commerce. First, he argues that because CF ships the urea by rail to Pine Bend governed by one bill of lading, but by truck from Pine Bend to the member coop-

eratives governed by another bill of lading, Roberts' transportation is intrastate. As the ICC noted in *Bigbee Transportation*, this does not preclude a finding of interstate commerce. *See also Swift Textiles, Inc. v. Watkins Motor Lines, Inc.*, 799 F.2d 697, 700–01 (11th Cir.1986) (finding separate carriers and bills of lading irrelevant where shipper's intent that goods go to destination beyond port of entry within state was clear), *cert. denied*, 480 U.S. 935, 107 S.Ct. 1577, 94 L.Ed.2d 768 (1987).

Levine also argues that because CF's shipments do not involve any storage-in-transit provisions,[3] shipments from Pine Bend to in-state locations are intrastate. It is true that the ICC has found such provisions evidence of a shipper's intent that goods travel interstate, *see, e.g., James River Corp.*, [1988–89] 3 Fed.Carr.Cas. at 47,380–81, but the lack of such a provision is not dispositive. In none of the ICC cases discussed above were the shipments subject to storage-in-transit provisions, but the ICC found all to involve interstate commerce. As the ICC stated in *Ottawa Strong*, "the presence of any one ... element is not always essential." [1988–89] 3 Fed.Carr.Cas. at 47,779. Moreover, the current test requires us to examine all of "the facts and circumstances surrounding the transportation;" to focus on any one fact would violate this standard.

In sum, the cases the district court relied on to hold that Roberts' intrastate transportation of urea was not a continuation of the interstate journey are either distinguishable or outmoded. After examining the facts and circumstances of Roberts' urea transportation, we conclude that CF had the fixed and persisting intent that its urea be shipped to its member cooperatives, and therefore that Roberts was engaged in interstate commerce.

### B. The Soybean Shipments

■ Roberts next argues on appeal that the district court erred in holding that his

---

3. A storage-in-transit provision is usually contained in a shipment's bill of lading or the shipper's tariff and the effect of such a provision is to designate goods as remaining "in transit" while they are warehoused, so that further transportation of the goods is a continuation of their shipment to the warehouse. *See Texas*, 866 F.2d at 1549.

transportation of soybeans constituted intrastate commerce, and that he thus was subject to Minnesota's regulatory authority. In reaching this determination, the district court relied primarily on *Arkadelphia Milling Co. v. St. Louis S.W. Ry.*, 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517 (1919). In *Arkadelphia*, the Supreme Court held that the movement of rough lumber from the forest to a mill, where it was made into barrel hoops and staves, was not interstate commerce even though ninety-five percent of the hoops and staves went on to other states. *Id.* at 151, 39 S.Ct. at 244. The Court stated:

> It is not merely that there was no continuous movement from the forest to the points without the State, but that when the rough material left the woods it was not intended that it should be transported out of the State, or elsewhere beyond the mill, until it had been subjected to a manufacturing process that materially changed its character, utility, and value.

*Id.*

The district court also relied on *Crescent Cotton Oil Co. v. Mississippi*, 257 U.S. 129, 42 S.Ct. 42, 66 L.Ed. 166 (1921), where the Supreme Court held that the separation of the seed from the fiber of cotton by means of a cotton gin constituted "manufacturing" under *Arkadelphia*. *Id.* at 136, 42 S.Ct. at 43–44. The Court then noted that this manufacturing was subject to state regulation, and that interstate commerce began only after the ginning process, when the seed was committed to a carrier for interstate transport. *Id.; see also Utah–Idaho Sugar Co. v. Federal Trade Comm'n*, 22 F.2d 122, 125 (8th Cir.1927) (stating that "there is no [interstate] commerce to obstruct until [after manufacturing takes place]"). The import of the *Crescent Cotton* decision is that manufacture of an item interrupts the stream of commerce so that after manufacture there is a new commercial journey, either inter- or intrastate.

Roberts argues that the critical distinction between these cases and the facts in this case is that the soybeans were merely *processed* in the Mankato plants, not *man-* *ufactured.* In support of this argument, Roberts relies on language in *Anheuser–Busch Brewing Ass'n v. United States*, 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336 (1907), where the Supreme Court stated: "Manufacture implies a change, but every change is not manufacture.... [S]omething more is necessary.... There must be transformation; a new name and different article must emerge...." *Id.* at 562, 28 S.Ct. at 206–07. Applying this definition, the Court held that Anheuser–Busch's cleaning, drying, soaking in a chemical bath, and then drying again, of cork to seal beer bottles was not manufacture: "A cork put through [this] process is still a cork." *Id.* Roberts argues that Honeymead's and ADM's treatment of raw soybeans is more akin to Anheuser–Busch's treatment of cork than to Arkadelphia's treatment of lumber. Therefore, Roberts argues, no manufacture is involved in this case. Because soybean oil and meal are not manufactured, but merely processed, Roberts contends, his in-state transportation is merely the first leg of a journey in interstate commerce because Honeymead and ADM intend to export the soybean oil and meal. In support of this, Roberts cites *Southern Pac. Terminal Co. v. I.C.C.*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911), where the Supreme Court held that the grinding of cotton seed cake into meal did not interrupt the stream of interstate commerce because the grinding was incidental to the meal's export. *Id.* at 526, 31 S.Ct. at 287–88.

Roberts' argument fails for three reasons. First, the cases he relies on are distinguishable. In *Anheuser–Busch*, the Supreme Court defined "manufacture" for the purpose of determining the proper import duties on cork; whether the cork traveled in inter- or intrastate commerce was not at issue. *Southern Pacific* did involve interstate commerce, but in that case the intrastate shipper also was the "processor" and the exporter. Here, the Sleepy Eye Elevator (Elevator) is the intrastate shipper, but Honeymead and ADM are the "processors" and exporters. Furthermore, *Southern Pacific*'s "incidental processing" analysis conflicts with the Supreme Court's later analysis in

*Arkadelphia. See Baltimore & O.R. Co. v. United States,* 15 F.Supp. 674 (N.D.N.Y. 1936). As Judge Learned Hand observed in *Baltimore & O.R. Co.,* "the determining factor [in *Arkadelphia* ], . . . was that the raw material was made into a new article [of commerce] at the stop." *Id.* at 676. In *Southern Pacific,* the raw cotton seed cake was also made into a new article, cotton seed meal. That *Arkadelphia* "contradicts," as Judge Learned Hand put it, *Southern Pacific* is clear. Therefore, we do not believe that *Southern Pacific* is relevant to our analysis.

Roberts' argument also fails because it does not satisfy the "fixed and persisting intent" test. It is important to note that the soybean shipper is the Elevator, not Honeymead or ADM. Therefore, the processors' intent that the soybeans continue on in interstate commerce is irrelevant. The stipulated facts are silent as to the Elevator's intent when shipping soybeans. The facts and circumstances of the transportation show that the Elevator does not intend to ship soybeans, or more precisely, raw soybeans, in interstate commerce. Just as the shippers in *Arkadelphia* did not intend their raw lumber to travel in interstate commerce, so the Elevator did not intend the raw soybeans to travel in interstate commerce. In both situations, the only product that traveled in interstate commerce was a new commodity, one that had been materially changed in "character, utility, and value." As Judge Learned Hand concluded: "[T]he creation of an article of commerce, as distinct from the packing, bailing and the like of an existing one, will generally be a terminus of transportation." *Baltimore & O.R. Co.,* 15 F.Supp. at 676.

The third reason why Roberts' manufacturing-processing distinction fails is that it is contradicted by current ICC policy and practice. Roberts' assertion that soybean oil and meal are not "manufactured" is belied by an ICC regulation that lists soybean oil and meal as manufactured commodities. *See* 49 C.F.R. § 1047.25 (1989). His attempt to distinguish between manufacturing and processing is unsupported by recent ICC decisions. In *May Department Stores,* one of the factors the ICC relied on in finding interstate commerce was that there was no activity at the warehouse that "change[d] the character" of the imported goods. [1990] 3 Fed.Carr.Cas. at 47,205. Similarly, in *Pittsburgh–Johnstown,* the ICC explicitly noted that *"no further processing or manufacturing"* of the goods occurred at the warehouse. [1990] 3 Fed. Carr.Cas. at 47,110 (emphasis added).

In sum, we hold that Roberts' transportation of soybeans from the Sleepy Eye Elevator to the processing plants in Mankato constituted intrastate commerce because the shippers did not have the fixed and persisting intent to ship raw soybeans in interstate commerce.

III.

For the foregoing reasons, we reverse the district court's judgment as to the urea and affirm the judgment as to the soybeans.