[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15636

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 23, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-22000-CV-UU

ELMO WALTERS,
ALIX PROVENCE,
CHARLENE BLACKSHEAR,
CEDRIC JORDAN,
and all others similarly situated,

Plaintiffs-Appellants,

versus

AMERICAN COACH LINES OF MIAMI, INC.,
a Florida corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 23, 2009)

Before DUBINA, Chief Judge, BIRCH and WILSON, Circuit Judges.

PER CURIAM:

This appeal requires us to determine whether Appellants, who are all current or former bus drivers for American Coach Lines of Miami ("ACLM"), are subject to a provision in the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., exempting from the FLSA's overtime requirements any employees who fall under the jurisdiction of the Secretary of Transportation under the Motor Carrier Act ("MCA"). The district court found Appellants to be eligible for this "motor carrier" exemption and therefore granted the portion of ACLM's motion for summary judgment addressing Appellants' claims for overtime wages. After reviewing the record and the parties' briefs and hearing oral argument, we AFFIRM the grant of summary judgment.

## I. BACKGROUND

ACLM is a private motor carrier providing for-hire ground transportation for passengers that holds itself out to be an "interstate" motor carrier. It is licensed with the United States Department of Transportation ("DOT"), holds all the authorizations from the Federal Motor Carrier Safety Administration ("FMCSA") necessary to be an interstate passenger motor carrier, and has been issued a DOT number. Since 2004, federal transportation agencies have audited ACLM at least twice, on at least one occasion in combination with Florida

2

authorities. ACLM also requires its drivers to meet DOT safety standards, which Florida has adopted as well. See Fla. Stat. § 316.302. ACLM does not pay its drivers overtime wages.

ACLM primarily provides transportation within the state of Florida, though some of its business is between Florida and other states. Much of ACLM's revenue comes from shuttling cruise ship passengers between the Miami and Fort Lauderdale airports and local hotels and cruise ship ports. Since September 2006, ACLM has had a written contract to be the sole provider of such transportation for Royal Caribbean Cruise Lines ("Royal Caribbean") during daytime hours. ACLM asserts that between April 2006 and December 2007 it transported more than 500,000 Royal Caribbean passengers, trips that resulted in over $4.4 million in revenues. Appellants contend that there is no proof that ACLM provided such transport prior to September 2006, though they appear not to dispute the total revenue figure. In addition to this written arrangement with Royal Caribbean, ACLM maintains that it earned over $700,000 from earlier informal agreements to provide similar shuttle transportation for Costa Cruises and Princess Cruises. Appellants likewise dispute the existence of such arrangements.

Under ACLM's contract with Royal Caribbean, it provides ground transportation for passengers who book vacation packages through travel agents or

3

Royal Caribbean. For those passengers, ground transportation is included as part of the overall package and is not priced or itemized separately. Passengers who do not pre-purchase ground transportation can request shuttle service when they arrive at the airport or cruise ship terminal, which will then be charged to that passenger's Royal Caribbean account.[1] Under the agreement, Royal Caribbean provides ACLM with weekly manifests listing the expected time, date, and number of passengers for each shuttle trip. Royal Caribbean employees greet passengers on arrival, contact ACLM when a bus is required, and collect vouchers from passengers before they board the bus. Royal Caribbean does not keep the vouchers nor does it give them to ACLM; rather, it gives ACLM a "load slip" with a head count for each trip. ACLM then uses these load slips to invoice Royal Caribbean for the trips. The agreement stated that ACLM would receive payment only if a passenger actually boarded the bus, with Royal Caribbean deciding whether to pay based on a per-person or per-bus rate.[2] As a result, ACLM receives all of its payments from Royal Caribbean, rather than the passengers.

---

[1] We can find nothing in the record stating whether a copy of the passenger's bill for this account would contain a separate price or listing for this charge.

[2] In February 2008, the parties amended the agreement so that Royal Caribbean would guarantee ACLM a minimum number of passengers per bus and would pay ACLM at a reduced rate for each passenger below this minimum.

In addition to these local shuttle services, ACLM also provided other forms of in-state and out-of-state motor coach transportation, including driving shuttle bus routes at the University of Miami. Between 2004 and 2007, ACLM drivers made at least 148 trips that involved out-of-state travel, some for as long as 90 days.[3] Both parties agree that approximately $1.7 million, or 4.06% of ACLM's total revenue during that period, came from these out-of-state trips and that about 19% of its drivers made such trips.[4] There appear to have been 75 ACLM drivers who made out-of-state trips during the time frame, which constitutes 19.08% of the 393 drivers employed by ACLM for that period.[5] Nine of the 63 Appellants (14.29%) made out-of-state trips for ACLM, and Appellants spent less than 286 days on such trips during the period in question.[6] ACLM does not keep records of how many trips its drivers make on a daily or annual basis, and there is no solid evidence regarding how many overall trips ACLM drivers made between 2004 and

[3] ACLM and the district court both cited the 148-trip figure, though there appear to be 150 out-of-state trips listed on the spreadsheet provided by ACLM. The discrepancy may reflect the fact that two entries are missing some data.

[4] According to our calculations, the percentage of revenue from these trips ranged from a low of 1.40% in 2004 to a high of 7.93% in 2005.

[5] The district court cited a figure of 74 drivers, but both parties appear to agree that 75 is correct. In any event, the lower figure would be 18.83% of ACLM's total workforce, so the net effect of this discrepancy is negligible.

[6] Of those Appellants who were employed by ACLM for more than a year, 6 of 23, or 26.09%, made such trips.

5

2007 nor of what percentage of those trips involved out-of-state travel. One ACLM executive agreed that 10,000 total trips a year would be a reasonable estimate. He stated that, if this estimate were correct, then around 100 of those trips would involve out-of-state travel, which would mean that approximately 1% of ACLM's total trips were out of state.[7]

In August 2007, three ACLM drivers brought suit against ACLM in the United States District Court for the Southern District of Florida. They alleged that ACLM had violated the FLSA's minimum wage and overtime provisions and Florida's whistleblower act. In December of that year, a fourth named plaintiff joined the suit, and the district court conditionally certified the class of all drivers employed by ACLM from 6 August 2004 to the present, a class that eventually comprised 63 plaintiffs.[8] Both parties filed motions for summary judgment. The drivers moved for partial summary judgment on, <u>inter alia</u>, the applicability of the

---

[7] Appellants attempt to assert that the actual percentage should be 0.25% or less, a figure based on a total number of trips that they derived by multiplying the ACLM executive's estimate of the number of buses on the road each day by the number of days in a year. This calculation would be accurate only if each bus averaged one trip per day. There is no evidence to support that inference since some out-of-state trips lasted more than one day and ACLM has not indicated how may shuttle runs it conducts per day. However, if one assumed that the 10,000 trip-a-year estimate was reasonable for 2007, then the 58 out-of-state trips actually taken that year would constitute about 0.6% of ACLM's total for the year.

[8] A total of 60 drivers decided to opt in to the case, although one later voluntarily dismissed his claim, leaving a total of 63 plaintiffs.

motor carrier exemption, whereas ACLM moved for summary judgment on all of the claims. In ACLM's motion, it asserted that, as a motor carrier, it was exempt from the overtime requirements of the FLSA and thus did not have to pay overtime to the employees.

The district court granted in part and denied in part the parties' respective summary judgment motions. The court found that all of the drivers, with the exception of those who predominately drove shuttle bus routes at the University of Miami, were exempt from the FLSA's overtime requirements by virtue of the motor carrier exemption.[9] It therefore granted ACLM's summary judgment motion with respect to the motor carrier exemption for the non-shuttle bus drivers. The drivers moved for reconsideration of the order, which the court denied. The court then entered final judgment against the non-shuttle bus drivers on their overtime claims. Appellants appealed that portion of the order granting in part ACLM's motion for summary judgment on the issue of whether it was eligible for the motor carrier exemption.

---

[9] The district court denied ACLM's summary judgment motion with respect to the shuttle bus drivers. That decision is not a part of this appeal.

## II. DISCUSSION

We review a district court's grant of summary judgment <u>de novo</u>. <u>See</u> <u>Waters v. Miller</u>, 564 F.3d 1355, 1356 (11th Cir. 2009). In conducting our review, we construe all facts and draw all reasonable inferences in favor of the non-moving party. <u>See</u> <u>id.</u>

### A. "Motor Carrier" Exemption

The FLSA requires employers to pay employees at time-and-a-half for any time worked in excess of forty hours per week. <u>See</u> 29 U.S.C. § 207(a)(1). However, the act specifically exempts from this requirement "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of" the MCA. <u>Id.</u> § 213(b)(1). Congress created this exemption to eliminate any conflict between the jurisdiction exercised by the Department of Labor ("DOL") over the FLSA and the mutually exclusive jurisdiction exercised by the DOT over the MCA. <u>See</u> <u>Spires v. Ben Hill County</u>, 980 F.2d 683, 686 (11th Cir. 1993). Because of this congressional intent, the Secretary of Transportation does not have to exercise the authority granted to him by the MCA for the motor carrier exemption to be applicable; instead, his power to regulate under the act merely needs to cover a particular group of employees. <u>See</u> <u>id.</u>

8

We construe FLSA exemptions narrowly against the employer.[10]  See

Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995) (per

curiam).  The employer bears the burden of showing its entitlement to the

exemption.  See id.  The Secretary of Transportation has authority under the MCA

"to regulate the maximum hours of service of employees who are employed (1) by

a common carrier by motor vehicle; (2) engaged in interstate commerce; and (3)

whose activities directly affect the safety of operations of such motor vehicles."

Spires, 980 F.2d at 686; see also 49 U.S.C. § 31502(b)(1); 29 C.F.R. § 782.2(a).

The MCA indicates that the Secretary has this power for, inter alia, all

transportation described in 49 U.S.C. § 13501.  See 49 U.S.C. § 31502(a)(1).

Section 13501 in turn provides the Secretary with jurisdiction "over transportation

by motor carrier" in various contexts, including between places in different states,

between places in the same state if the transport passes through another state, and

between the United States and a foreign country to the extent that the

---

[10] ACLM insists that this principle of construction should not apply to the motor carrier exemption because Congress intended that exemption to draw a boundary between the jurisdictions of the Secretaries of Transportation and Labor.  It contends that a narrow construction of the exemption would impermissibly restrict the Secretary of Transportation's MCA jurisdiction.  However, ACLM cites no cases supporting an alternate rule, and the case it references for the notion of mutual exclusivity explicitly construed the exemption narrowly.  See Spires, 980 F.2d at 689.  We therefore see no reason to depart from the traditional rule.

9

transportation occurs in the United States.[11]  Id. § 13501(1)(A), (B), (E).  The

motor carrier exemption applies only to those employees over whom the Secretary

of Transportation has this authority.  See 29 C.F.R. § 782.2(a).

The applicability of the motor carrier exemption "depends both on the class

to which his employer belongs and on the class of work involved in the employee's

job."  Id.  There are two requirements for an employee to be subject to the motor

carrier exemption.  First, his employer's business must be subject to the Secretary

of Transportation's jurisdiction under the MCA.  See Baez v. Wells Fargo

Armored Serv. Corp., 938 F.2d 180, 181–82 (11th Cir. 1991) (per curiam); id.

Second, the employee's business-related activities must "directly affect[] the

safety of operation of motor vehicles in the transportation on the public highways

of passengers or property in interstate or foreign commerce within the meaning of

the Motor Carrier Act."  Baez, 938 F.2d at 182; see also 29 C.F.R. § 782.2(a).  We

address these prongs in turn.

---

[11] For the period in question, the term "motor carrier" was defined as "a person providing commercial motor vehicle (as defined in [49 U.S.C.] section 31132) transportation for compensation."  Id. § 13102(14) (2007).  Section 31132 defines "commercial motor vehicle" as any "self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property" that was "designed or used to transport more than 8 passengers (including the driver) for compensation."  Id. § 31132(1)(B).

B. Secretary's MCA Jurisdiction over ACLM

For the first prong to be met, ACLM's bus service must be subject to the Secretary of Transportation's jurisdiction under the MCA. There a number of facts here to support such a finding. Most importantly, ACLM was licensed by the DOT, has the FMCSA authorizations necessary to be an interstate motor carrier, and was audited in the past by the DOT. As we have previously noted, the fact that a company holds these kind of authorizations indicates that the DOT has exercised jurisdiction over it. See Baez, 938 F.2d at 182 (noting that the fact that the Interstate Commerce Commission, which had authority over the MCA at the time, issued a permit to a company indicated that MCA jurisdiction already had been exercised over that company). Additionally, ACLM provided bus service that crossed state lines and derived about 4% of its revenue from those trips. It also held itself out as an interstate motor carrier.[12]

---

[12] We acknowledge that the current version of the MCA no longer contains language indicating that a company is subject to the act if it "holds itself out to the general public" as an interstate motor carrier. 49 U.S.C. § 303(a)(14) (1976); see Brennan v. Schwerman Trucking Co. of Va., Inc., 540 F.2d 1200, 1204 (4th Cir. 1976) (finding that party was subject to the Secretary's MCA jurisdiction because it "at all times relevant hereto held itself out as" an interstate motor carrier). It may be true, as Appellants contend, that this change reflects Congress' intent to eliminate the possibility of the Secretary exercising jurisdiction solely based on that factor. Nevertheless, we do not think it completely eliminates our ability to consider what we deem a relevant, albeit non-dispositive, factor.

11

Appellants contend that a carrier must engage in more than de minimus interstate commerce to fall under the Secretary's jurisdiction and that ACLM's small number of interstate trips would not meet this standard. Appellants' primary authority for such a requirement is Morris v. McComb, 332 U.S. 422, 68 S. Ct. 131 (1947). In that case, the Supreme Court found a business to be subject to MCA jurisdiction when about 3.65% of its total trips stemmed from interstate commerce, along with 4% of its revenues. See Morris, 332 U.S. at 427, 433–34, 68 S. Ct. at 133, 136–37. They also cite a number of other district court cases imposing similar requirements. See, e.g, Rossi v. Associated Limousine Servs., Inc., 438 F. Supp. 2d 1354, 1361 (S.D. Fla. 2006). On the whole, these cases suggest that a company's interstate business is de minimus if it constitutes less than one percent of the overall trips taken by the company. See Turk v. Buffets, Inc., 940 F. Supp. 1255, 1261–62 (N.D. Ill. 1996) (summarizing cases).

The de minimus requirement may be inapplicable to situations such as this, where the company has the appropriate federal licensing and there is undisputed proof of some transportation that crosses state lines. We can find no cases indicating that this evidence, by itself, would not be enough to meet the prong. Assuming arguendo that there is such a requirement, we find ACLM to have met it. In analyzing the de minimus question, we find it pertinent to consider both the

number of interstate trips made and the percentage of revenue the company earned

from those trips. See Garcia v. Fleetwood Limousine, Inc., 511 F. Supp. 2d 1233,

1238 (M.D. Fla. 2007). Although Morris principally focused on the number of

trips made, we believe the amount of revenue derived from those trips is likewise

indicative of the degree to which a business involves interstate transportation. See

Morris, 332 U.S. at 433–34, 68 S. Ct. at 137. In this case, the actual number of

trips that indisputably crossed state lines is relatively small, but the percentage of

revenues derived from those trips, 4.06%, is virtually identical to that which the

Supreme Court deemed sufficient to create MCA jurisdiction in Morris.[13] We find

this equivalency adequate to justify the same conclusion with respect to ACLM.

We therefore find that ACLM has met the first prong of the exemption test.

C. Secretary's MCA Jurisdiction over Appellants' Work-Related Activities

Having found that the Secretary of Transportation has jurisdiction over

ACLM, we turn to the question of whether the Secretary's jurisdiction also

encompasses Appellants' work-related activities. As previously noted, this would

be the case only if they were "engag[ing] in activities of a character directly

---

[13] Appellants question ACLM's statements about its actual revenues, which they assert reflect "turn-around" runs that involved driving empty buses to and from a location. However, as the district court noted, Appellants have not offered a legal rationale for excluding these revenues.

13

affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a). The parties do not dispute that Appellants engaged in activities of a character that directly affected the safety of operation of motor vehicles. We thus need to determine whether these activities constituted "interstate commerce" as that term is understood in the MCA.

The DOL's regulations indicate that the definitions of the MCA itself determine what constitutes transportation in interstate or foreign commerce sufficient to bring an employee within the Secretary of Transportation's purview. See 29 C.F.R. § 782.7(a). The MCA and FLSA do not have identical conceptions of what constitutes interstate commerce. See id. However, to make enforcement easier, the regulations assume that a movement that would constitute interstate commerce under the FLSA would likewise constitute interstate commerce under the MCA, "except in those situations where the [Interstate Commerce] Commission has held or the Secretary of Transportation or the courts hold otherwise." Id. § 782.7(b)(1). Accordingly, if "it has been authoritatively held that transportation of a particular character within a single State is not in interstate commerce" under the MCA, there would be no motor carrier exemption even if the

14

facts established a "'practical continuity of movement' from out-of-State sources," which would constitute interstate commerce under the FLSA.  Id.

Courts are "guided by practical considerations" in determining whether an employee's activities would be part of interstate commerce for purposes of the FLSA.  Marshall v. Victoria Transp. Co., Inc., 603 F.2d 1122, 1123 (5th Cir. 1979) (quotation marks and citation omitted).  "When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character."[14]  United States v. Yellow Cab Co., 332 U.S. 218, 228, 67 S. Ct. 1560, 1566 (1947), overruled on other grounds by Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S. Ct. 2731 (1984).  As a result, purely intrastate transportation can constitute part of interstate commerce if it is part of a "continuous stream of interstate travel."  Chao v. First Class Coach Co., Inc., 214 F. Supp. 2d. 1263, 1272 (M.D. Fla. 2001).  For this to be the case, there must be a "practical continuity of movement" between the intrastate segment and

---

[14] Although Yellow Cab involved a Sherman Anti-Trust Act claim, courts have looked to it for guidance regarding the scope of interstate movement under different statutes including the MCA.  See, e.g., Packard v. Pittsburgh Transp. Co., 418 F.3d 246, 256–57 & n.10 (3d Cir. 2005). If anything, Yellow Cab's conception of interstate commerce may be more restrictive than that applicable for FLSA claims.  See Marshall, 603 F.2d at 1124.

15

the overall interstate flow. Walling v. Jacksonville Paper Co., 317 U.S. 564, 568, 63 S. Ct. 332, 335 (1943); see also Bilyou v. Dutchess Beer Distribs., Inc., 300 F.3d 217, 223 (2d Cir. 2002) (applying this standard in analyzing applicability of motor carrier exemption).

In Marshall, we addressed a city bus service in Brownsville, Texas, which often transported people who had walked across the Mexican border before boarding the bus. See Marshall, 603 F.2d at 1123–24. We characterized the transportation of people making international journeys as "a regular, recurring and substantial part" of the bus drivers' overall workload. Id. at 1125. Because the drivers' work thereby was "entwined with a continuous stream of international travel," we concluded that the drivers were engaged in interstate commerce, even though their routes were solely intrastate.[15] Id. The Supreme Court reached a similar conclusion in United States v. Capital Transit Co., 338 U.S. 286, 70 S. Ct. 115 (1949). That case involved a bus service that drove routes within the District

---

[15] We reached a similar conclusion in a case addressing "interstate commerce" in the context of the Commerce Clause. See Executive Town & Country Servs., Inc. v. City of Atlanta, 789 F.2d 1523 (11th Cir. 1986). That case involved an airport limousine service, which transported out-of-state or international passengers who had arranged for pick-up, along with local residents who had not made such arrangements. See id. at 1525–26. We noted that taxicab service from the airport generally would not be part of the stream of interstate commerce because it would play only a minor role in the taxicab company's overall business. See id. However, we found that this particular service did form part of that stream because the pre-arranged nature of the rides meant that 90% of its passengers were making interstate journeys of which the wholly intrastate cab rides were part of a continuous stream. See id.

16

of Columbia that took commuters to locations where they then could board buses bound for Virginia. See id. at 288, 70 S. Ct. at 116. The Court found that the Interstate Commerce Commission ("ICC") had regulatory authority under the MCA over those intra-district bus routes because they were "part of a continuous stream of interstate transportation" and thus formed "an integral part of an interstate movement." Id. at 290, 70 S. Ct. at 117.

These cases indicate that ACLM's airport-to-seaport routes would come under the Secretary's MCA jurisdiction. Its shuttle trips share a practical continuity of movement with the interstate or international travel of the cruise lines and their passengers, just as the Brownsville bus routes did for their riders' cross-border journeys. For cruise ship passengers arriving at the airport or seaport, ACLM's shuttle rides would be part of the continuous stream of interstate travel that is their cruise vacation. The Royal Caribbean patrons in particular would have no reason to have any alternate view since the fee for the shuttle ride would either be bundled as part of their cruise vacation package or would be included on the bill for their Royal Caribbean shipboard account.

D. Possible Limitations on Secretary's MCA Jurisdiction

Appellants make three arguments as to why we should find ACLM not to have met the second prong, which we address in turn. First, they maintain that we

17

should not read the motor carrier exemption as applying to "interstate commerce" when that term does not appear in the relevant statute. Second, they assert that the Secretary is divested of jurisdiction over ACLM's airport-to-seaport routes by the "incidental-to-air" exemption, 49 U.S.C. § 13506(a)(8)(A). Third, they contend that those routes could constitute interstate commerce only if there was a through-ticketing arrangement between ACLM and an air carrier.

### 1. Statutory Text

Appellants assert that the applicability of the motor carrier exemption should be governed by the plain text of the statutes. They maintain that this language specifically limits the Secretary's MCA transportation solely to transportation that actually crosses state lines. See 49 U.S.C. § 13501(1). According to Appellants, this is the only permissible interpretation of the Secretary's jurisdiction, particularly in light of our dictate to narrowly construe FLSA exemptions, and that the airport-to-seaport routes would not qualify as interstate under this rationale.

We decline to adopt such a restrictive reading. Courts consistently have interpreted the scope of MCA exemptions using the "interstate commerce" understanding. See, e.g., Bilyou, 300 F.3d at 223; Foxworthy v. Hiland Dairy Co., 997 F.2d 670, 672 (10th Cir. 1993). In fact, the only authority Appellants can cite

18

for their reading, apart from the statutory text itself, is a concurring opinion in a

Third Circuit case, which no court since has followed.  See Packard, 418 F.3d at

259–60 (Nygaard, J., concurring in judgment).  Moreover, that rationale is at odds

with our past cases finding MCA exemptions to apply to workers whose activities

involved exclusively intrastate transportation or handling of goods that were

bound for out-of-state destinations.  See Baez, 938 F.2d at 181–82 (finding

armored car drivers who made intrastate deliveries of checks which ended up

outside the state to be subject to motor carrier exemption); Galbreath v. Gulf Oil

Corp., 413 F.2d 941, 942, 947 (5th Cir. 1969) (finding that motor carrier

exemption applied to drivers who performed solely intrastate transportation of

petroleum products that originated out-of-state).  Additionally, the DOL's own

regulations appear to support applying the exemption to situations in which the

activity at issue does not involve interstate transit.[16]  See 29 C.F.R. § 782.7(b)(1)

(noting that "it will ordinarily be assumed . . . that the interstate commerce

requirements of the section 13(b)(1) exemption are satisfied" when the employee's

intrastate transportation "is part of an interstate movement of the goods or persons

_____

[16] Appellants have cited no decisions, other than the Packard concurrence, holding to the contrary, so there is no reason to think that the FLSA's conception of interstate commerce would not apply.  See 29 C.F.R. § 782.7(b)(1).

19

being thus transported so as to constitute interstate commerce within the meaning of the Fair Labor Standards Act").

### 2. "Incidental-to-Air" Exemption

Appellants also contend that, even if the airport-to-seaport routes would be considered part of interstate commerce, Congress divested the Secretary of Transportation of jurisdiction over those routes by enacting the "incidental-to-air" exemption, 49 U.S.C. § 13506(a)(8)(A). That provision states that "[n]either the Secretary nor the Board has jurisdiction under this part over . . . transportation of passengers by motor vehicle incidental to transportation by aircraft." 49 U.S.C. § 13506(a)(8)(A). DOT regulations provide that such transport would be "incidental" if it is limited to those passengers "who have had or will have an immediately prior or immediately subsequent movement by air" and if it occurs entirely within a 25-mile radius of the airport. 49 C.F.R. § 372.117(a).

Appellants argue that this exemption divests the Secretary of jurisdiction under § 13501 over ACLM, because that statute is the only provision under that subpart of Title 49 to address jurisdictional issues. Since the applicability of the motor carrier exemption depends on whether the Secretary has power over a motor carrier under § 13501, this reading would mean that the incidental-to-air exemption would make the motor carrier exemption inapplicable to ACLM. See

20

49 U.S.C. § 31502(a)(1). The parties do not dispute that ACLM's airport-to-seaport drives would fall under the terms of the incidental-to-air exemption because the drives all are immediately prior or subsequent to air travel and occur within a 25-mile radius of the airport. The only issue we must decide is whether the exemption would bar the Secretary from exercising jurisdiction over ACLM with respect to FLSA issues, which would thereby make the motor carrier exemption inapplicable to the company.

As the district court noted, Appellants' argument appears to be at odds with the plain language of the statute. Though 49 U.S.C. § 31502(a)(1) references § 13501 to determine the scope of the Secretary's authority under the MCA, it does so only to indicate to what transportation the MCA applies. See id. There is no indication that this provision is meant to incorporate anything other than the descriptions of transportation contained in § 13501. Any exemptions to § 13501 would therefore seem to be irrelevant. This reading is supported by the fact that § 31502(a) also cites 49 U.S.C. § 13502, which contains a specific carve-out from the Secretary's jurisdiction for transportation between Alaska and other states that occurs in a foreign country, but does not reference any other possible jurisdictional exceptions to § 13501. See id. §§ 13502, 31502(a)(1).

21

An examination of the background of the incidental-to-air exemption further indicates that it was not intended to limit the Secretary's jurisdiction over overtime issues. The difficulty in analyzing the scope of the exemption derives from the wording of the current version of the MCA, the parts of which have been amended and separated over the years. The original version of the act specifically stated that the incidental-to-air exemption did not apply to regulations under Section 204 of the MCA that discussed such topics as maximum hours.[17] See id. § 303(b)(7a) (1948 ed.); see also Bingham v. Airport Limousine Serv., 314 F. Supp. 565, 570 (W.D. Ark. 1970) (noting that the exemption did not limit the Secretary's authority under the MCA to impose hours and safety regulations). However, Congress later revised the statute and removed the references to Section 204 and wage and hour issues. The current version now discusses eliminating the Secretary's jurisdiction under "this part." Id. § 13506(a)(8)(A).

No court appears to have addressed the scope of this specific exemption, but a number have examined similarly worded MCA exemptions. In Bilyou, for

---

[17] That version stated:

Nothing in this part, except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment shall be construed to include . . . the transportation of persons or property by motor vehicle when incidental to transportation by aircraft.

See 49 U.S.C. § 303(b)(7a) (1948 ed.).

22

example, the Second Circuit examined the legislative history of 49 U.S.C. § 13505, which divested the Secretary of jurisdiction under "this part" over transportation unrelated to a primary business. 49 U.S.C. § 13505; see Bilyou, 300 F.3d at 225–29. Based on the court's examination, it found that the provision addressed solely economic matters and therefore did not limit the Secretary's jurisdiction over issues relating to safety and hours. See Bilyou, 300 F.3d at 226. The court also commented that § 31502 is in a different part of the MCA from the exemption at issue and that the jurisdictional limitation imposed by that exemption would not impact the Secretary's authority under § 31502.[18] See id.

Appellants cite one case, Mielke v. Laidlaw Transit, Inc., 102 F. Supp. 2d 988 (N.D. Ill. 2000), reaching a contrary holding, i.e., that such an exemption would eliminate the Secretary's MCA jurisdiction over all matters relating to a particular motor carrier, including with respect to the regulation of hours and safety.[19] See Mielke, 102 F. Supp. 2d at 990–92. That court focused principally on the statutory text and found that the reference to "this part" had to be read as

[18] As the Second Circuit noted, at least two other circuits have reached similar conclusions, albeit without engaging in the same examination of legislative history. See Bilyou, 300 F.2d at 225 (citing Klitzke v. Steiner, 110 F.3d 1465, 1468 (9th Cir. 1997); Friedrich v. U.S. Computer Servs., 974 F.2d 409, 413 (3d Cir. 1992)).

[19] They contend that we should read Spires as supporting this interpretation as well; however, it addressed the motor carrier exemption in general and did not engage in any form of statutory interpretation. See generally Spires, 980 F.2d 683.

referring to the totality of the Secretary's regulatory power. See id. However, no other court appears to have adopted this rationale, and the few that have addressed this issue since Bilyou and Mielke have followed the interpretation of the former. See, e.g., King v. Asset Appraisal Servs., Inc., 470 F. Supp. 2d 1025, 1031–32 (D. Neb. 2006).

We likewise find Bilyou's statutory analysis more persuasive than Mielke's. Though the current version of the exemption does not contain specific references to hours and safety regulation, the elimination of that language likely reflects the fact that the separation of the various sections of the MCA rendered the reference to Section 204 meaningless. There is no indication in the legislative history that Congress intended to alter its original view regarding the effect of the incidental-to-air exemption. See H.R. Rep. No. 96-1069 at 19 (1980) (noting that revisions to the exemption were made to reflect the fact that certain kinds of transportation were exempt from economic regulation by the ICC). Furthermore, as the Second Circuit noted, the other subsections of the relevant part of the MCA all appear to be at least tangentially related to matters involving economic regulation, such as registration of motor carriers, financial reporting requirements, and merger and acquisition regulation. See, e.g., 49 U.S.C. §§ 13901, 14123, 14303. More importantly, the DOT's own regulations define "exempt motor carriers" as those

24

exempt from economic regulation under § 13506 but still subject to safety regulations, such as maximum hours laws. See 49 C.F.R. § 390.5. Accordingly, we find that the incidental-to-air exemption does not eliminate the Secretary's authority to regulate maximum hours under the FLSA.

### 3. "Through-Ticketing" Requirement

Appellants also contend that airport-to-seaport trips cannot constitute interstate commerce unless they are part of a "through-ticketing" arrangement with the airlines or cruise lines. A through-ticketing arrangement involves an agreement "between the motor carrier and the air carrier for continuous passage" of passengers. In Re Kimball, 131 M.C.C. 908, 918 (1980). Appellants cite a number of decisions by the Surface Transportation Board ("STB") and ICC, as well as district court cases, in which such an arrangement was required for the Secretary to have jurisdiction over an employer whose business involved such intrastate trips. See, e.g., Morrison v. Quality Transps. Servs., Inc., 474 F. Supp. 2d 1303, 1310 (S.D. Fla. 2007); Rossi, 438 F. Supp. 2d at 1362; Kimball, 131 M.C.C. at 918; Motor Transp. of Passengers Incidental to Transp. by Aircraft, 95 M.C.C. 526, 536 (1964). They maintain that ACLM's relationships with Royal Caribbean and the other cruise lines do not meet this requirement.

The parties dispute whether the through-ticketing requirement even applies to the second prong of the motor carrier exemption analysis here. The STB and ICC decisions cited by Appellants indicate that a through-ticketing or common arrangement is required for intrastate transportation of airplane passengers to be interstate commerce. See Kimball, 131 M.C.C. at 918; Motor Transp., 95 M.C.C. at 536. As ACLM notes, those cases involved disputes over the applicability of the incidental-to-air exemption. See Kimball, 131 M.C.C. at 912; Motor Transp., 95 M.C.C. at 529–30, 540. Since that exemption addresses the Secretary of Transportation's jurisdiction over an employer, those decisions may say nothing about whether there would be a similar requirement for employees' activities to be in interstate commerce. Furthermore, since those cases discuss a through-ticketing requirement between a motor carrier and an air carrier, they may be inapplicable to an arrangement between a motor carrier and a cruise line. See Kimball, 131 M.C.C. at 918; Motor Transp., 95 M.C.C. at 536. However, at least one district court required a motor carrier to have a through-ticketing arrangement with a non-air carrier to meet the second prong of the analysis.[20] See Morrison, 474 F. Supp. 2d at 1310–12. Additionally, our obligation to construe FLSA exemptions

---

[20] Another district court considered the existence of a through-ticketing arrangement during this stage of the analysis, although it did not require it to be present. See Chao, 214 F. Supp. 2d at 1271–73.

26

narrowly would support requiring such an agreement when there is some dispute about the applicability at this stage of the analysis.

In an abundance of caution, we therefore decline to decide whether a through-ticketing arrangement is necessary and instead look at whether ACLM has established that it has such an arrangement assuming one would be applicable. Appellants maintain that the requirement can be met only if there is a formalized agreement between a motor carrier and an air carrier. However, that approach does not accord with the relevant precedent. In fact, the ICC appears to deem it sufficient that there be some sort of "common arrangement" with an out-of-state carrier, which need not be an air carrier. See Motor Transp., 95 M.C.C. at 536 (discussing requirement that there be a common arrangement with "connecting out-of-State carriers"). Courts generally have followed the ICC's interpretation and found the requirement to be met even when there is no through-ticketing agreement so long as there is evidence of a contractual connection between the motor carrier and the interstate carrier. See, e.g., Pennsylvania Pub. Util. Comm'n v. United States, 812 F.2d 8, 11–12 (D.C. Cir. 1987) (finding that a motor carrier had a common arrangement with an air carrier when it "operated pursuant to an explicit contract" with the airline, and that this was sufficient for the ICC to find

27

the motor carrier's activities to be in interstate commerce, despite the absence of a through-ticketing agreement).

ACLM's relationship with Royal Caribbean would meet this common arrangement requirement. It had a formal agreement with Royal Caribbean since September 2006 to transport passengers between hotels, airports, and seaports. Under this arrangement, ACLM did not operate as an independent part of the cruise passengers' overall transportation, even though it involved a distinct mode of transport from the plane flight and cruise ship. Instead, from the perspective of the cruise passengers, ACLM's trips were an essential and intrinsic component of the overall stream of interstate travel transporting the passengers from their points of departure to the cruise ships (and exotic foreign and out-of-state ports of call) and back home again.

ACLM also has presented sufficient evidence that it had common arrangements with cruise lines prior to September 2006. Though it had no formal contract with a cruise line before that date, it put forward evidence showing that it had arrangements with Princess Cruises and Costa Cruises during that time, that those relationships were similar to that which it now has with Royal Caribbean, and that it earned substantial amounts of revenue from these connections. According to a vice president for ACLM, these arrangements involved the cruise

28

lines selling pre-arranged tickets for airfare, ground transportation, occasionally accommodation, and the cruise itself. The cruise lines agreed to pay ACLM a fixed amount for its services, which was based on an hourly figure that reflected the market rate at the time.

Appellants contest the existence of any relationship between ACLM and these cruise lines. Notably, though, they do not offer evidence to contradict ACLM's assertions about the nature of its ties with the cruise lines or about the revenue earned from these connections. In the absence of any clear indication that ACLM did not have the relationships it claims, and bearing in mind the evidence ACLM presented, we view it as having established that its ties with the cruise lines were sufficient to constitute a "common arrangement" throughout the period in question. Compare with Powell v. Carey Int'l, 483 F. Supp. 2d 1168, 1186 (S.D. Fla. 2007) (finding no through-ticketing arrangement because the evidence indicated that the relationship was "a loose affiliation between businesses"); Morrison, 474 F. Supp. 2d at 1310 (denying employer's summary judgment motion regarding applicability of motor carrier exemption in part because the employees contradicted the employer's evidence regarding the terms of its alleged through-ticketing arrangement).

29

Accordingly, even if a through-ticketing arrangement is required for the airport-to-seaport routes to constitute interstate commerce and thus come under the Secretary's MCA jurisdiction, ACLM has shown that such an arrangement existed throughout the period in question. Since Appellants have conceded that they reasonably could be expected to drive such routes, we find ACLM to have met the second prong of the motor carrier exemption test.[21] We therefore conclude that the district court correctly granted ACLM's motion for summary judgment with respect to the applicability of that exemption.

## III. CONCLUSION

Appellants contend that the district court erred in granting ACLM's motion for summary judgment with respect to the applicability of the motor carrier exemption. We find ACLM to have provided sufficient evidence both that it was subject to the Secretary of Transportation's jurisdiction under the MCA and that the activities of its employees also fell under the Secretary's MCA jurisdiction. We therefore AFFIRM the district court's grant of ACLM's motion for summary judgment with respect to the motor carrier exemption.

**AFFIRMED.**

---

[21] Because we reach this conclusion on the basis of ACLM's airport-to-seaport routes, we need not address ACLM's alternative argument that the second prong would be met because Appellants reasonably could be expected to drive trips that indisputably crossed state lines.