[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12195
Non-Argument Calendar

_____

D.C. Docket No. 8:16-cv-03532-SCB-TGW

SCOTT EHRLICH,
o/b/o themselves and others similarly situated in the state of Florida,
SALVATORE REALE,
o/b/o themselves and others similarly situated in the state of Florida,
GARY PRUSINSKI,
o/b/o themselves and others similarly situated in the state of Florida,

Plaintiffs - Appellants,

versus

RICH PRODUCTS CORPORATION,
a foreign profit corporation,

Defendant - Appellee,

PETER J. GRILLI,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 4, 2019)

Before JORDAN, JILL PRYOR and HULL, Circuit Judges.

PER CURIAM:

Appellants Scott Ehrlich, Salvatore Reale, and Gary Prusinski are Route Sales Representatives ("RSRs") employed by appellee Rich Products Corporation ("Rich"). The RSRs seek unpaid overtime compensation under the Fair Labor Standards Act, 29 U.S.C. §§ 201-19 (the "FLSA"). Rich argues that the RSRs are not entitled to overtime compensation because they fall within an exemption to the FLSA's overtime requirements: the Motor Carrier Act (the "MCA") exemption set forth in 29 U.S.C. § 213(b)(1). Whether the MCA exemption applies turns on whether the RSRs transported items in interstate commerce. We agree with the district court that the RSRs transported items in interstate commerce and therefore affirm its decision granting summary judgment to Rich.

## I.      BACKGROUND

Rich employs RSRs to order, sell, and deliver Carvel® ice cream cakes and other frozen desserts (the "products"). The plaintiff RSRs, who were paid weekly salaries, allege that they worked far more than 40 hours a week to fulfill their duties.

Rich manufactures the products in Connecticut and other states outside of Florida. The products are perishable, with a shelf life of approximately six months. The products make a long journey from their place of manufacture to the

2

ultimate consumer.  First, Rich ships the products from manufacturing facilities via refrigerated tractor-trailer trucks.  Rich instructs the trucking company when and where to pick up the products.  Second, Rich instructs the trucking company to deliver the products to an Orlando, Florida storage warehouse facility owned by Burris Logistics, Inc. ("Burris").  Third, shuttle trucks transport the products from Burris's warehouse to delivery trucks.  Fourth, the delivery trucks, driven by the RSRs, deliver the products to retail stores in Florida.

Rich manufactures and ships its products based on sales forecasts.  Rich forecasts long term (two-year) future sales, then adjusts its forecasts monthly.  In making these forecasts, Rich considers the following factors, among others: historical customer demand, weather events, and store promotions, losses, and closings.

In deciding how much of the products to ship to the Burris warehouse, Rich tries to minimize the risk of shipping too much and thus losing products to spoilage.  Once products arrive at the Burris warehouse, Rich instructs that they be shipped on a "first-in, first-out" basis.  Doc. 45-8 at 6.[1]  The products completely turn over—in terms of dollar value—more than once a month.  Some products do not sell, however; when this occurs, Rich either disposes of them as "out of date" or sells them to prisons or food banks.  *Id.* at 5-6.

---

[1] All citations in the form "Doc. #" refer to numbered entries on the district court docket.

3

Rich has a contract with Burris that allows Rich to oversee and control the products at the Burris warehouse so that Rich's orders are filled and its inventory is adjusted. The products arrive packaged and are not altered before transfer by shuttle trucks out of the warehouse for delivery.

On behalf of themselves and others similarly situated, the RSRs sued Rich, seeking overtime wages under the FLSA. They contended that, from 2013 through 2016, they worked more than the overtime threshold of 40 hours per week but were "misclassified" as exempt from the FLSA overtime requirements. Doc. 1 at 2. Rich moved for summary judgment based on the argument that the RSRs were exempt from the overtime pay provisions of the FLSA because they were engaged in interstate commerce when making their deliveries to retail stores. In response, the RSRs submitted, among other evidence, a PowerPoint presentation in which Rich's management advised the RSRs that due to the Department of Labor's new rules relating to minimum salary requirements under the FLSA, Rich would begin paying them overtime.

The district court granted Rich's motion for summary judgment. The court determined that there were no genuine disputes of material fact that the RSRs were engaged in interstate commerce when delivering the products. The court therefore concluded that the RSRs were exempt from receiving overtime under the MCA exemption.

4

This is the RSRs' appeal.

## II.    STANDARD OF REVIEW

We review the district court's decision to grant summary judgment *de novo*, "viewing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in favor of that party." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1141 (11th Cir. 2014). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.    LEGAL ANALYSIS

The FLSA requires employers to compensate covered employees at an overtime rate if they work more than 40 hours in a week. 29 U.S.C. § 207(a)(1). Congress enacted the FLSA "with the goal of protecting all covered workers from substandard wages and oppressive working hours." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012) (alteration adopted) (internal quotation marks omitted). But the FLSA's overtime compensation requirement "does not apply with respect to all employees." *Id.* Under the MCA exemption, workers are exempt from the FLSA's overtime requirement if the United States Secretary of Transportation is authorized to set their maximum hours. *See* 29 U.S.C. § 213(b)(1). We construe the FLSA exemptions, including the MCA exemption,

5

narrowly against employers.  *See Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009).

In the MCA, Congress authorized the Secretary of Transportation to set maximum hours of service for certain employees of a "motor carrier."  *See* 49 U.S.C. § 31502(b).  The Secretary's authority to set maximum hours extends to all "transportation . . . described in section[] 13501 . . . of this title."  *Id.* § 31502(a)(1).  Section 13501, in turn, covers transportation between places in different states, between places in the same state if the transportation passes through another state, and between the United States and a foreign country to the extent that the transportation occurs in the United States.  *Id.* § 13501(1).

From these statutory provisions, we have distilled two requirements for the Secretary to have jurisdiction to set an employee's maximum hours, considering both the nature of the employer's business generally and the nature of the work involved in the employee's job.  First, the "employer's business must be subject to the Secretary of Transportation's jurisdiction under the MCA."  *Walters*, 575 F.3d at 1227.  Second, "the employee's business-related activities must directly affect the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA]."  *Id.* (alteration adopted) (internal quotation marks omitted).  Even purely intrastate transportation can constitute part of interstate

6

commerce if "it is part of a continuous stream of interstate travel," meaning there is "a practical continuity of movement between the intrastate segment and the overall interstate flow." *See id.* at 1229 (internal quotation marks omitted).  Here, the RSRs do not dispute that the first requirement is satisfied because Rich is subject to the jurisdiction of the Secretary of Transportation, so we focus our analysis on whether the RSRs were engaged in interstate commerce when driving their delivery trucks.

We conclude that the evidence, viewed in the light most favorable to the RSRs, shows that the RSRs were engaged in interstate commerce when making their deliveries.  Although the RSRs transported the products only in Florida, their deliveries were a part of a continuous stream of interstate commerce because there was a practical continuity of movement between the RSRs' deliveries to the retail stores and the overall interstate flow.

A critical factor in determining whether there is a practical continuity of movement depends on the shipper's "fixed and persisting intent . . . at the time of shipment." 29 C.F.R. § 782.7(b)(2).  Put differently, we look at whether, at the time of shipping, the shipper intended to maintain the flow of the products through the facility, rather than allowing the products to languish at the facility.  We ascertain this intent "from all the facts and circumstances surrounding the

transportation." *Roberts v. Levine*, 921 F.2d 804, 812 (8th Cir. 1990) (internal quotation marks omitted).

Here, the uncontroverted evidence establishes that Rich intended a continuity of movement of the products through the Burris warehouse because it intended for the products to be stored at the warehouse on only a temporary basis. Rich set the quantity of products that it shipped based on its internal projections for demand for its products. It created long term forecasts, projecting demand over the next two years, and adjusted these forecasts each month with review of the projections every day in order to ensure that the forecasts were accurate and reflected real-time projections for demand of the products. The forecasts were based not only on historical customer demand but also on weather events and store promotions, store losses, store closings, and other factors. With these projections, Rich sought to ensure that it shipped enough products to meet customer demands but not so much that it would incur a loss due to product spoilage.

Using these real-time projections of customer demand, Rich generally dispatched two shipments of products to the Burris warehouse each week but never completely filled its space at the warehouse. Rich would release the products stored at the warehouse on a "first-in, first-out" basis. Doc. 45-8 at 6. Under this rotation, Rich experienced at the Burris warehouse, in terms of the dollar value, a complete turnover of its products more than once a month. This is not to say that

8

Rich necessarily turned over every item each month; sometimes products remained at the Burris warehouse for a longer period of time, most often due to store closings. From the uncontroverted evidence, though, we can infer that when Rich shipped the products, it intended for them to be stored at the Burris warehouse on only a temporary basis.

The RSRs argue that the evidence demands a conclusion that Rich's intent at the time of shipping the products was to send them only to the Burris warehouse and not to the ultimate customers because Rich had not yet received specific orders from specific customers for the products that it shipped. But no such strict requirement applies. As a policy statement from the Interstate Commerce Commission advises, a shipper may have a "fixed and persisting intent" that products travel in interstate commerce, even though they are stored in a warehouse before delivery to customers in the same state, when the shipper bases its total volume of products to ship on "projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State," which can include "historic sales in the State, actual present orders, [and] relevant market surveys of need." Motor Carrier Interstate Transportation—From Out-of-State Through Warehouses to Points in Same State, 57 FR 19812-01, 1992 WL 93608

9

(May 2, 1992) ("1992 ICC Policy Statement").[2]  This policy statement, then, makes clear that Rich had a fixed and persisting intent for the products to travel interstate, given the fact-based forecasting used to decide the volume of products to ship.

The only support that the RSRs marshal for their position is a recent district court decision in *Avila v. CWC Transportation, LLC*, No. 17-60041-CIV-O'SULLIVAN, 2018 WL 572025 (S.D. Fla. Jan 26, 2018).  There, the district court determined that genuine issues of material fact about the shipper's fixed, persisting intent at the time of shipment precluded summary judgment, including whether the shippers delivered products to fulfill specific orders. *Id.* at *10.  We are unpersuaded by *Avila* because the district court failed to consider the 1992 ICC Policy Statement's guidance that a shipper has a fixed and persisting intent when it bases the total volume of products to ship on "projections of customer demand that have some factual basis."  *See* 1992 ICC Policy Statement.

In a related argument, the RSRs contend that because some products remained at the Burris warehouse for several months, at the time of shipment Rich

---

[2] We note that other courts have relied on this policy statement when considering whether a shipper had a fixed and persisting intent.  *See, e.g.*, *Harris v. Performance Transp., LLC*, No. 8:14-CV-2913-T-23 AAS, 2016 WL 7666177, at *3 (M.D. Fla. July 11, 2016); *Williams v. Kenco Logistic Servs., Inc.*, No. 8:09-CV-709-T-26MAP, 2010 WL 2670852, at *4-5 (M.D. Fla. July 2, 2010).  Rich does not argue that the 1992 ICC Policy Statement is inapplicable or should not be followed here.

intended only to ship the products to the warehouse, not to the ultimate retailers. We accept that the RSRs' evidence is sufficient to show that some of Rich's products actually remained at the warehouse for a period of several months. But the Eighth Circuit's decision in *Roberts* is illustrative. *See* 921 F.2d 804. There, the court held that storage for up to six months did not defeat intent when the shipper set quantities based on "past demand and estimated future need." *Id.* at 814. The same is true here. Given the evidence about how Rich determined the volume of products to ship, we cannot infer that at the time Rich shipped the products it lacked a fixed and persisting intent to ship the products to retailers. *See Williams v. Kenco Logistic Servs., Inc.*, No. 8:09-CV-709-T-26MAP, 2010 WL 2670852, at *7 (M.D. Fla. July 2, 2010) ("The fact that a few [products] may have remained in the [warehouse], even perhaps for years, does not vitiate [the seller's] intent.").

The RSRs also argue that a jury could find that Rich intended to send the products only to the warehouse at the time that it shipped them based on the degree of control that Burris exercised over the products while they were stored at the warehouse. After the products were delivered to Burris's warehouse, Burris placed the items into its inventory and Rich had to submit a purchase order to retrieve them. It is true that Burris handled, released, and transferred the products Rich temporarily stored in the warehouse. But in its contract with Burris, Rich reserved

11

the right to oversee and control the storage, ensure that inventory was correct, and guarantee that products were pulled for shipment. No processing or modification of the products occurred at the Burris warehouse. We cannot agree with the RSRs that Rich's use of a warehouse owned by Burris established that at the time of shipment Rich intended only to transport the goods to the warehouse and no further.

Viewing the record evidence in the light most favorable to the RSRs, the RSRs were engaged in interstate commerce when driving their delivery trucks. Because the RSRs were engaged in interstate commerce, they were subject to the MCA exemption and not entitled to overtime under the FLSA.[3]

---

[3] In a final argument, the RSRs argue that a jury could infer that they are entitled to overtime because Rich's decision to begin paying its drivers overtime created a material fact precluding summary judgment. Not so. Rich's 2016 decision to reclassify the RSRs and pay them overtime forms no basis, as a matter of law, for determining whether the RSRs fell within the MCA exemption. A business's reclassification of employees "is not materially relevant to the determination of whether [the employees] fall within" the exemption claimed by the employer. *Clarke v. JPMorgan Chase Bank*, *N.A.*, No. 08 Civ. 2400(CM)(DCF), 2010 WL 1379778, at *22 (S.D.N.Y. Mar. 26, 2010). The court in *Clarke* reasoned that an employee's exemption from overtime depends only upon that employee's job duties. *Id.* We agree. Because Rich's decision to reclassify the RSRs says nothing about the RSRs' duties, we do not infer from reclassification that the MCA exemption did not apply to the RSRs.

Nor does Rich's decision to pay the RSRs overtime render them non-exempt. An employer may pay additional compensation to an exempt employee without jeopardizing that exemption. 29 C.F.R. § 541.604.

## IV.    CONCLUSION

For the reasons set forth above, we affirm the district court's grant of summary judgment to Rich.

**AFFIRMED.**